Esther D. STANLEY, Administratrix of the Estate of Arthur L. Stanley, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant and Third-Party Plaintiff,

v.

The STATE OF OHIO, Third-Party Defendant.

Guy PARSONS, as Administrator of the Estate of Clyde Parsons, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant and Third-Party Plaintiff,

v.

STADVEC AVIATION, INC., and the State of Ohio, Third-Party Defendants.

Civ. A. Nos. 37279, 37310.

United States District Court
N. D. Ohio, E. D.
March 10, 1965.

Raymond J. McGowan and William R. Ferguson, Akron, Ohio, for plaintiff Esther D. Stanley.

Robert F. Belovich, Parma, Ohio, for plaintiff Guy Parsons.

Merle M. McCurdy, U. S. Atty., Bernard J. Stuplinski, Asst. U. S. Atty., Michael R. Wherry and Wallace E. Maloney, Attys., Dept. of Justice, Washington, D. C., for defendant United States.

John R. Cole, Asst. Atty. Gen., for the State of Ohio.

GREEN, District Judge.

These actions were brought under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) et seq. The complaints sought recovery for the alleged wrongful deaths of plaintiffs' decedents, as a result of a mid-air collision between a Piper Tri-Pacer, in which they were flying, and an F–84F jet aircraft operated by a member of the Ohio Air National Guard. The actions were based upon the alleged negligence of an employee of the Federal Aviation Agency, who was the control tower operator at the Mansfield Municipal Airport.

The United States impleaded the State of Ohio and Stadvec Aviation, Inc. as third party defendants, Rule 14(a), Federal Rules of Civil Procedure. Subsequently, Stadvec Aviation was dismissed as a party to the Stanley Action.

The cases were ordered consolidated for purposes of trial, Rule 42(a), Federal Rules of Civil Procedure, both actions arising from the same occurrence.

The basic facts in these actions are not in sharp dispute, although there are some contradictions in the evidence as to details.

The collision occurred on November 7, 1959 at about 2:16 P.M., approximately two and one-half miles south of the Mansfield Airport, at a point near the location of the Ohio State Reformatory. It is agreed that the weather conditions prevailing at the Mansfield Municipal Airport at that time were broken to overcast clouds at 3,500 feet; visibility 12 miles; wind southeast at four knots. It is further agreed that the field elevation of the Mansfield Airport is approximately 1300 feet above sea level, and that the collision occurred at about 2800 feet MSL, or 1500 feet above field elevation.

The plane in which Mr. Stanley and Mr. Parsons were flying was a relatively new Piper Tri-Pacer, identification No. N 9609 D, and was cream color, with either red or blue trim. The plane was equipped with an operating VHF radio transmitting and receiving set, having the appropriate frequencies necessary for transmission to the Mansfield tower and for receiving transmissions from the said tower.

The Piper Aircraft departed from the Akron Municipal Airport at approximately 1:45 P.M., Eastern Standard Time. The intended flight course was from Akron to Mansfield and return, nonstop. The purpose of the flight was to obtain necessary pilot's time for Mr. Parsons to qualify for a private pilot's certificate. Mr. Stanley was employed as an instructor pilot by Stadvec Aviation, Inc., and Mr. Parsons held a student pilot's license, having 28 hours flying time. At the time of take-off Mr. Parsons was seated in the left forward seat, normally the pilot's seat, and Mr. Stanley was seated in the right forward seat.

It is admitted that prior to commencing their flight neither of plaintiffs' decedents filed a flight plan.

Since about 1948 the Mansfield Municipal Airport had an Air National Guard Unit operating from its facilities. Jet aircraft were stationed as a part of such unit since 1952, and the F84 jets had been operating out of Mansfield since 1956.

In the 1959 edition of the Airmen's Guide, which was stated to be a standard source of information for pilots, the Mansfield airport was listed as being a military base.

When the jet aircraft were first introduced into the Mansfield facilities there was no control tower at the field. The control tower was built about 1956.

There were in effect on November 7, 1959, Parts 60 and 617 of the Civil Air Regulations (14 C.F.R. 60 and 617), containing a number of regulations pertinent hereto. Such regulations, which were published in the Federal Register, have the force and effect of law. Maryland Casualty Co. v. United States, 251 U.S. 342, 349, 40 S.Ct. 155, 64 L.Ed. 297 (1920). All pilots are required to have thorough knowledge of Part 60 of the Regulations, and take written tests concerning the same.

Section 60.60 of the Regulations defines a "control zone" to be,

" * * * an airspace of defined dimensions extending upwards from the surface to include one or more airports. Control zones are intended to encompass the flight paths of aircraft during the take-off and landing and are normally a circular area of five miles radius with an extension along the instrument approach path."

Section 617.1 of the Regulations has a similar definition of a control zone.

Section 60.30 of the Regulations establishes the rules for what is known as VFR minimum weather conditions, VFR designating visual flight rules. The evidence in these actions clearly establishes that at the time of the accident here in suit the prevailing weather was VFR.

Although the weather conditions were VFR, the evidence indicated that to the southwest of the Mansfield airport there was a hazy and smoky area in which visibility was difficult. This area is over a corner of the City of Mansfield which is partially industrial.

At the time of this accident there had been posted at the Mansfield airport a request by the airport manager to all pilots, local and itinerant, to avoid using the airspace between 2300–3300 feet MSL (which would be 1000–2000 feet above ground level) in passing through the control zone, as the same was reserved to jet aircraft. The request was unpublished, and there is no proof that either of the decedents had knowledge of the request, although there was some evidence that Mr. Stanley had been on the ground at Mansfield airport on several occasions.

On November 7, 1959 a flight of four Ohio Air National Guard F 84 F jet aircraft took off from Mansfield airport at about 1:30 P.M. The purpose of the flight was to provide training for one of the jet pilots.

At about 2:15 P.M. the jet aircraft were approaching the Mansfield airport. There is some conflict in the evidence as to precisely the heading of such aircraft.

The lead pilot, Lt. Col. Emerson E. Lewis, testified that the planes were flying a course northwest to southeast. On the other hand, Mr. Ira L. Ludwig, who was in the Flight Data Position in the control tower, testified that the jets were coming in from the north, rather than the northwest.

Mr. Chester F. Jatczak, a member of the jet flight, also testified to a NE–SE course. Mr. Clayton Tschantz, the airport manager, also testified as to the flight line of the jets. He stated that the course was NW to SE, estimating the heading to be 140 degrees to the SE.

It is the Court's conclusion that the flight of jet aircraft was approaching the Mansfield airport on a course generally northwest to southeast.

At about this same time, the Piper aircraft was approaching the airport. Its heading was estimated by the witnesses to be southwest to northeast on a 45-degree heading. Flying on such a heading, the Piper aircraft would be passing over the northwest edge of the City of Mansfield and passing through the hazy area referred to by some of the witnesses.

Lt. Col. Lewis testified that as the jet flight was approaching the field he called the control tower to request clearance for a low approach. A low approach was described as a maneuver whereby a plane flies through the control zone at a lower altitude than normal for continuing aircraft, and at speeds above landing speed. It is generally used in practicing for instrument landings. The evidence indicated that the jets crossed the field at about 345 m.p.h., whereas their normal landing speed is 170–195 m.p.h.

There is a conflict in the evidence as to how far out the jets were when the request for clearance was made.

Lt. Col. Lewis testified that he made his call and received clearance when he was eight miles out from the control tower, and repeated this procedure when he was three miles out. He tesified that on both occasions the tower responded that the jet flight was cleared for approach, no report of other traffic.

Mr. Ludwig testified that he first received a request for clearance when the jets were two miles out, and that this was somewhat closer in than was normal.

Mr. Ludwig testified that at the time he received the call from the jets he was in contact with several other aircraft, and the tape transcript of tower transmissions shows conversations between the tower and five aircraft between 2:14 and 2:16 P.M.

Upon receiving the call from the jets requesting the clearance for low approach, Mr. Ludwig checked for recorded aircraft in the area and made a visual 360 degree scan for other aircraft. Mr. Ludwig stated that he had no record of other aircraft in the area which would interfere with the flight of the jets and observed no such aircraft on his visual scan. He then cleared the jets for the low approach.

■ The Court finds from the evidence that at the time Mr. Ludwig cleared the jets for a low approach, the Piper aircraft in which the decedents were flying had made no radio contact with the Mansfield control tower. Mr. Ludwig testified to that fact, and the tape transcript reflects no transmissions to that aircraft.

Mr. Vincent Pedini, a private pilot, was approaching the Mansfield airport at about the time concerned. He radioed in to the tower reporting his position from about 10 miles north of the field. He stated that when he was about 6–8 miles out from the tower he heard a transmission from the tower; "Will Tri-Pacer 10 or 12 miles east of field repeat message?" Plaintiffs contend that this statement might have been in response to a message from the plane in which their decedents were flying.

The tape transcript does not reflect a message as recalled by Mr. Pedini, and Mr. Ludwig could not recall such a transmission. In any event, the Court does not believe that such a message could have been related to the decedents' aircraft. Their Piper was approaching the tower on a 45-degree heading from the southwest, whereas the message referred to a plane approaching from the east.

Although Mr. Pedini testified that he was not warned of the presence of the jet aircraft in the area, the tape transcript reflects a warning from the control tower to another aircraft, identified as 9452 B, to look out for jet aircraft clearing the control zone. There was no general warning given to all aircraft in the area, however, regarding the activity of the jet aircraft.

Having received clearance from the tower to make the low approach, the jet flight passed over the airport area. The planes were flying in fingertip formation at the time of pass, and passed over the airport to the west of the control tower. After the planes had passed over the

field they went into a left bank preparatory to making a 270 degree turn to come in for a landing. Lt. Col. Lewis testified that he entered into the bank a little earlier than normal, because he wanted to avoid flying over the city, where the haze had decreased the visibility.

Both Lt. Col. Lewis and Mr. Jatczak testified that they were looking to the southeast as they crossed the field and observed no other aircraft. Neither of them observed the impact with the Piper, which was apparently struck by the wing tip of the number four jet aircraft, flying on the outside of the formation, which also crashed as a result of the collision. All the jets were in a complete bank at the time of impact.

The evidence clearly establishes that the point of collision was within the Mansfield tower's control zone.

From the testimony of Mr. Tschantz and Mr. G. B. Herring, both of whom observed the converging aircraft, it appears that both the jet flight and the Piper held to their respective courses, and neither took any action to evade the other. Both parties had the planes in sight for only a very short period of time before the impact occurred.

After becoming aware of the collision, Lt. Col. Lewis radioed to a ground based mobile recovery unit to proceed to the site of the crash, and then brought the jet flight in for its landing.

The complaints allege, in essence, negligence on the part of the control tower operators at Mansfield Municipal Airport in the following respects:

1) Permitting a "low pass" over the Mansfield Airport.
2) Failing to warn the Piper of the F–84Fs' low approach.
3) Failing to warn the F–84F pilots of the Piper's presence.
4) Failing to ascertain the presence of the Piper within the control zone.
5) Failing to keep both planes advised of the other's activities.

By way of defense, the government contends that under the facts and circumstances shown herein, the government, acting through the control tower operators, owed no duty to either of plaintiffs' decedents, and that the tower operators were not negligent.

The government further contends that the facts establish contributory negligence on the part of both decedents. It is the contention of the government that in visual flight rule weather the responsibility for collision avoidance rests upon the pilots of the aircraft involved.

The Court has earlier referred to parts 60 and 617 of the 1957 Civil Air Regulations (14 C.F.R. 60 and 617). Certain of the said regulations are highly pertinent to these actions, and are set out below, in their pertinent parts:

*"60.2 Authority of the Pilot*

"The pilot in command of the aircraft shall be directly responsible for its operation and shall have final authority as to operation of the aircraft.

*"60.10 Application*

"Aircraft shall be operated at all times in compliance with the following general flight rules and also in compliance with either the visual flight rules or the instrument flight rules, whichever are applicable.

*"60.12 Careless or Reckless Operation*

"No person shall operate an aircraft in a careless or reckless manner so as to endanger the life or property of others.

*"NOTE:* Examples of aircraft operations which may endanger the life or property of others are:

"(c) Lack of vigilance by the pilot to observe and avoid other air traffic * * *

*"60.14 Right-of-Way*

"* * * The aircraft which has the right of way will normally maintain its course and speed, but nothing in this part relieves the pilot from the responsibility for taking

such action as will best aid to avert collisions.

*"60.15   Proximity of Aircraft*

"No person shall operate an aircraft in such proximity to another aircraft as to create a collision hazard.

*"60.18   Operation on and in the Vicinity of an Airport*

"Aircraft will be operated on and in the vicinity of an airport in accordance with the following rules:

"(b) If air traffic control is in operation at the airport, contact shall be maintained with such control, either visually or by radio, to receive any air traffic control instructions which may be issued.

*"617.21   General Responsibility*

"(a) *Responsibility of airport traffic control towers* (1) An airport traffic control tower is responsible for the issuance of clearance and information to pilots of aircraft for the purpose of protecting air traffic by aiding pilots in the prevention of collision between   *   *   *

"(iii) Aircraft landing and taking off and in the traffic pattern.

"(b) *Responsibility of pilots* (1) When flying in visual flight rule weather conditions it is considered the direct responsibility of the pilot to avoid collision with other aircraft. Under such conditions, the information and clearances issued by the control tower are intended to aid pilots in avoiding collision.

*"617.22   General*

"Airport traffic controllers shall· maintain a watch on visible flight operations in the control zone   *   * and shall control such traffic in accordance with the procedures set forth herein and all applicable air traffic rules.

*"617.45   Traffic Clearances*

"(a) General:  An airport traffic controller shall issue such traffic clearances and other information as are, in his judgment, necessary for the purpose of protecting air traffic by aiding pilots in the prevention of collisions between aircraft under the controller's jurisdiction.

"(b) A clearance issued by an airport traffic control tower is authority for a pilot to proceed only insofar as known air traffic conditions and field conditions are concerned *   *   *

"(1) Clearances issued by airport traffic controllers are predicated upon known or observed traffic and field conditions which in the judgment of the controller, affect safety in aircraft operations   *   *   *

*"617.55   General*

"(a) When operating in visual flight rule conditions, it is the responsibility of ·the pilot to avoid collision with other aircraft.  However, to aid pilots to avoid collisions, information shall be issued concerning pertinent known or observed traffic in the air or on the ground.

"(b) Information concerning traffic within the control zone should relate to traffic which is known to or observed by the controller and which, in his judgment, constitutes a potential hazard to the operation of the aircraft concerned."

The cumulative effect and import of these regulations may be stated as follows: In visual flight rule weather the primary responsibility for avoiding mid-air collisions rests with the pilots of the aircraft, and the function of the airport traffic control tower is to aid the pilots to avoid collisions by issuing traffic clearances or other information based on known or observed aircraft in the area which, in the traffic controller's judgment, constitute a potential hazard to the operation of the aircraft concerned.

The alleged grounds of negligence, as previously set forth herein, may be put into three categories:

1) Permitting the "low pass" over the Mansfield Airport.

2) Failing to ascertain the presence of the Piper within the control zone.

3) Failing to warn the aircraft of each other's presence and activities.

With regard to permitting the low pass, plaintiffs argue that to permit this maneuver at a time when civilian aircraft were operating in the area necessarily constituted a collision hazard.

Mr. Ludwig testified that his authority to deny clearance for a low approach existed only when he was aware of other air traffic that constituted a specific hazard. This statement is in accord with the rights and duties of a control tower operator as set forth in § 617.45 of the Civil Air Regulations, 14 C.F.R. 617.45.

■ As Mr. Ludwig did not have any recorded aircraft within the control zone, and stated that he did not observe any such aircraft, his granting of clearance for the low pass cannot be said to have been a negligent act.

This necessarily leads to consideration of the question of whether there was any negligence in failing to ascertain the presence of the Piper aircraft and determine that it was a hazard.

The Piper aircraft was traveling on a 45 degree heading, and was coming into the control zone from the southwest quadrant. It was that area which was referred to as being smoky and hazy, with diminished visibility.

The Piper made no radio contact with the control tower to advise of its presence and obtain any clearance or traffic information. While such a call was not required by the Civil Air Regulations, it was suggested, 14 C.F.R. § 60.18(b), and both Mr. Tschantz and Mr. Pedini testified that it is considered prudent to inform a tower of a plane's presence in the control zone, and they each observed that practice. Mr. Tschantz stated that he would circumvent a control zone unless he was on a landing approach pattern or advised the tower of his presence.

Mr. Ludwig testified that he made a 360 degree visual scan at the time the jets requested clearance for a low approach. At that time the jets were about 2–3 miles out from the airport.

■ The Court does not believe that Mr. Ludwig was negligent in failing to observe a small cream colored aircraft coming into the control zone from a hazy segment of sky, which was broken to overcast clouds at 3,500 feet, which aircraft had not made any radio contact to alert others to its general proximity to the airport, particularly under the evidence as to his duties and other necessary activities at the time.

■ The control tower operator not knowing of the presence of the converging Piper aircraft, there could be no obligation to issue any warning concerning the movements of the jets, and, conversely, no obligation to inform the jets of the presence of a plane the tower operator had no reason to believe was in the area. The duty of the tower operator is to aid traffic by issuing information on known or observed traffic, 14 C.F.R. 617.45, 617.55.

Assuming, however, that the tower operator should have been aware of the presence of the Piper, it does not follow that plaintiffs would be entitled to verdicts herein.

■ The essence of the matter is that in visual flight rule weather the function of the control tower operator is advisory, and the primary responsibility for avoiding mid-air collisions is upon the pilots. This does not mean that a control tower operator can never be guilty of negligence proximately contributing to such a collision, for under given circumstances such liability may exist, Eastern Air Lines v. Union Trust Co., 95 U.S. App.D.C. 189, 221 F.2d 62 (1955).

The facts in Eastern Air Lines v. Union Trust Co., supra, are indicative of the type of occurrence which will impose liability upon the United States.

In that action the evidence established that the control tower operator cleared both a commercial airliner and a private aircraft for landing on the same runway at approximately the same time. The private plane was approaching from

above and behind the commercial craft. Because of a structural peculiarity in the private plane, its pilot could not see ahead of him except at a considerable distance. For an adequate period of time before the collision both planes were visible to the control tower personnel who knew they were on converging approaches with the private plane approaching the airliner from behind.

The Court found negligence on the part of the control tower operator in clearing both planes for the same runway at approximately the same time and thereafter failing to issue appropriate warnings to the converging aircraft. The dissimilarity of that case to the facts shown herein is manifestly apparent, as the case under consideration does not involve a situation where two aircraft were landing or taking off from the area involved.

In other cases wherein negligence was alleged on the part of control tower operators based on "failure to warn," the courts have generally denied recovery.

In United States v. Schultetus, 277 F.2d 322, 86 A.L.R.2d 375 (CA 5, 1960) a plaintiff's verdict rendered by the District Court was reversed as clearly erroneous. The evidence established that the converging, and eventually colliding, aircraft were navigating in VFR weather. The District Court ruled that the tower should have given the aircraft a general warning signal. In reversing, the Court of Appeals held that there was no negligence shown, and did not therefore consider questions of contributory negligence, stating:

"What we have said also disposes of the so-called finding that the tower operators negligently failed to maintain control over the two aircraft so that each would be properly spaced so as to avoid collision. Here again the district court has overlooked the principle that the direct and primary responsibility for the operation of aircraft over or in the vicinity of an airport rests upon the pilots of the aircraft." id. p. 328.

A different approach, producing the same result, was adopted in United States v. Miller, 303 F.2d 703 (CA 9, 1962). Again a plaintiff's verdict was reversed on appeal, but on the basis that the decedent had been guilty of contributory negligence as a matter of law, obviating the necessity for examining the District Court's findings of negligence on the part of the control tower operators. The Court stated:

"In finding that Miller was not contributorily negligent the trial court may have felt that where a control tower is present to direct traffic, the controllers have the primary responsibility for controlling aircraft so as to prevent collisions, and that pilots are under such circumstances relieved from the duty otherwise placed upon them to accord the right of way as prescribed by rule.

"Such a view would be erroneous, because the focal point of ultimate responsibility for the safe operation of aircraft under VFR weather conditions rests with the pilot. Under such conditions he is obligated to observe and avoid other traffic, even if he is flying with a traffic clearance." id. p. 710.

The Court believes that under the authority of the Miller and Schultetus holdings recovery by plaintiffs is precluded under the facts in this record. See also, New York Airways, Inc. v. United States, 283 F.2d 496, 498 (CA 2, 1960) ; Khourey v. American Airlines, Inc., 170 Ohio St. 310, 164 N.E.2d 402 (1960).

Judgments will be entered in favor of the United States and against the plaintiffs in civil actions Nos. 37279 and 37310, and the third-party complaints of the United States in each of the said actions are ordered dismissed.

This memorandum is adopted as Findings of Fact and Conclusions of Law, in accordance with Rule 52, Federal Rules of Civil Procedure.