Alec S. HAMILTON, Jr., et al., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

James P. VAN GILDER, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Deborah Ann WHITLOW et al.,
Plaintiffs,

v.

UNITED STATES of America,
Defendant.

LEWIS & CLARK TRADING CO. et al.,
Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Nos. C–48398, C–48454, C–48618
and C–50802.

United States District Court,
N. D. California.

Oct. 22, 1971.

James L. Browning, Jr., U. S. Atty., William B. Spohn, Asst. U. S. Atty., San Francisco, Cal., Raymond D. Battocchi, Dept. of Justice, Washington, D. C., for defendant & 3rd party plaintiff United States.

Bronson, Bronson & McKinnon, San Francisco, Cal., for plaintiff Lewis & Clark Trading Co.

Hoberg, Finger, Brown & Abramson, San Francisco, Cal., for plaintiff Alec S. Hamilton, Jr.

Ned Good, Los Angeles, Cal., for plaintiff Deborah Ann Whitlow.

Nichols, Williams, Morgan & Digardi, Oakland, Cal., for plaintiff James P. Van Gilder.

Ropers, Majeski, Kohn, Bentley & Wagner, Redwood City, Cal., for 3rd party defendant James P. Van Gilder.

Bennett, Van de Poel, Campbell & Ginder, Oakland, Cal., for 3rd party defendants California Aviation Services, Inc.

## MEMORANDUM OF DECISION

CONTI, District Judge.

These actions arise out of the mid-air collision of two small twin-engined planes, a Piper Apache and a Cessna 310, at a point about one-half mile from the threshold of Runway 27 at Oakland Airport on Friday, February 17, 1967. At the time of the accident, about 2.30 p. m., Visual Flight Rules (VFR) were in effect. Mr. Hamilton and Mr. Whitlow, the two pilots in the Cessna 310,[1] were killed, and Mr. Van Gilder, the pilot of the Piper Apache,[2] was injured. The three plaintiffs subsequently brought

---

1. The Cessna 310's registration number was N3608D. In the transcript of recorded conversation between the air traffic control tower and individual aircraft the Cessna 310 is referred to by the last three symbols of its registration number (08D) or as "zero eight delta". Whitlow was the student pilot and Hamilton the instructor pilot.

2. The Apache's registration number was N2043P. It is referred to as "four three papa".

these actions against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671–2680, claiming, in essence, that the accident was caused by the negligence of the air traffic controllers, agents of the United States. Also consolidated in this trial is an action for property damage brought pursuant to the provisions of the Federal Tort Claims Act; the plaintiffs, Lewis & Clark Trading Co., and H. J. Stockman, doing business as Lewis & Clark Trading Co., are the purported owners of the Cessna, N3608D, being flown by Hamilton and Whitlow.

At the time of the accident, flight visibility was about four miles with haze and smoke, and air traffic at the Oakland Airport was moderate to heavy. Visual Flight Rules (VFR) were in effect. Under VFR conditions (commonly referred to as "see and be seen" conditions), unlike Instrument Flight Rule (IFR) conditions, pilots navigate aircraft and execute takeoffs and landings visually and not by instruments.

At Oakland Airport runways 27 right (27R) and 27 left (27L) are parallel runways running in a direction from east to west. The runways are each 150 ft. in width and are separated by 1000 ft. from the center line of runway 27R to centerline of runway 27L. At the time in question, all the aircraft using runways 27R and 27L were landing at the east threshold of the runways and taking off towards the west. There was testimony by tower controller McCready that two planes could land simultaneously on runways 27R and 27L; this was done and was permissible.

The air traffic control tower is situated to about a mile south of runways 27 and near their eastern end, it is approximately 5600 ft. from tower to landing threshold of 27R, and 4500 ft. to landing

threshold of 27L. The air traffic control function on runways 27 was being performed by Mr. Story, an experienced air traffic controller who had transferred to Oakland only recently.[3] Mr. Story's activities were being monitored by Mr. McCready, an experienced controller who was more familiar with Oakland airport.

Under the radio system in use at Oakland, the Cessna and the Apache could hear the transmissions from the tower to them and to other aircraft operating in the control zone on the same frequency. Likewise, both aircraft could hear all transmissions from other aircraft to the tower. On the day in question, because of haze and smoke in the area toward the east, and because of the outlying hills, the ability of the controllers to see traffic approaching from the east was decreased.

There was a radar scope in the tower; however, no evidence was produced as to the "practice" to utilize this scope, it being referred to as a "Mickey Mouse" scope, and evidence was presented in that it was not customary to use this equipment as it had certain limitations.

At 218.45 p. m. the Cessna 310 reported to the tower that it was over Castro Valley, an area about 8 miles east of the airport, and indicated an intention to land. Two seconds later, Mr. Story authorized the 310 to make a straight in approach to runway 27R and instructed it to report on two mile final, i. e., two miles from the end of the runway. The 310 promptly acknowledged receipt of this instruction. At this point the 310 may have been travelling at an approach speed of about 120 m. p. h. (or two miles per minute). Mr. Story then turned his attention to other planes in the airport traffic area.[4]

During the next four and one-half minutes the control tower exchanged radio communications at least once with

3. When an air traffic controller transfers from one airport to another, he customarily serves in a "trainee" status at the new airport until he becomes familiar with the procedures and particularities of that airport. The "training" period generally lasts for a few months.

4. The airport traffic area encompasses, at a minimum, the area (below 2000 ft. in altitude) covered by a circle with a 5-mile radius emanating from the control tower. See 14 C.F.R. (1967) 71.11.

eleven different planes (apart from the Cessna 310), and exchanged several communications with many of these eleven planes. At 223.18, 4 minutes and 33 seconds after the 310 contacted the tower, and the 310 not having reported at two-mile final as it was instructed to, Mr. Story called the 310 and expressly requested its position. No answer was received.

At 223.25, seven seconds later, Mr. Story called the 310 a second time. Again, no answer was received.

From 223.25, when Mr. Story called the 310 a second time, until 223.46, twenty-one seconds later, neither the 310 nor any other plane contacted the tower. At the later time, and the 310 still not having answered, Mr. Story called the 310 for the third time. For the third time no response was transmitted to the control tower. At this time neither Mr. Story (nor Mr. McCready, who was monitoring his activities) could sight the 310.

Shortly thereafter, at 223.48, the Piper Apache contacted the tower, reporting its position as 5 DME miles from the airport on the two seven right localizer.[5] At 224.20 Mr. Story authorized the Apache to continue a straight in approach for runway 27R, and expressly instructed it to report "crossing the freeway on two mile final."[6] Mr. Story then communicated with another plane (nine zero fox) (90F).

At 225.06, well more than six minutes after it reported at Castro Valley, the Cessna 310 reported to the tower that it was "coming up on the freeway" for runway 27R.[7] Mr. Story then authorized the 310 to "continue straight in approach". At this time Mr. Story did not have the 310 in sight and he did not give it a clearance to land.

Mr. Van Gilder heard the 310 reporting in as any pilot could who was tuned to the same frequency. Although under VFR conditions the pilot has the primary duty to "see and be seen", and can, therefore, be expected to listen carefully for any traffic in his vicinity, nevertheless, at 225.17, Mr. Story expressly informed the Apache that a Cessna had reported approaching the freeway on two mile final.[8] The tower did not have either in sight at this time.

During the approximately one-half minute after informing the Apache of the 310's position, Mr. Story communicated with two other aircraft in the control zone. One plane, zero seven kilo (07K), reported over Lake Chabot (a point about 6 miles east north east of runway 27R), and was instructed to enter the right traffic pattern.[9] The other plane, four nine juliette (49J), was travelling due east on a line parallel to and south of 27L; Mr. Story cleared 49J for a touch and go landing on 27L.[10] Shortly after 49J acknowledged the tower's landing clearance,

5. "DME" refers to distance measuring equipment, and DME miles are nautical miles; the 27R localizer refers to a diverging electronic signal, the centerline of which may be visualized as an extension of the runway centerline. Thus a plane 5 DME miles out on the 27R localizer is at a point on the outer border of the traffic control zone, approximately 4–5 statute miles from the end of the runway (and 5–6 statute miles from the control tower).

6. The "freeway" refers to the Nimitz freeway which a plane on a straight in approach to runway 27 would cross at about two miles from the threshold to the runway.

7. As noted, supra, a plane coming from the east would cross the freeway at about 2 miles from the threshold to the runway. Castro Valley is due east of runway 27R.

8. The control tower tape transcript shows the following: "225.17 tower: four three papa Oakland tower traffic Cessna reported approaching freeway on two mile final over."

9. Planes in the right traffic pattern, i. e., planes waiting for a landing clearance on 27R, will be flying in the opposite direction from aircraft on final approach, on a line parallel to and north of 27R.

10. A "touch and go" landing involves allowing the wheels of the plane to touch the runway and then applying full power so that the plane promptly takes off; it is a maneuver commonly used to practice landings and take-offs. To execute the touch and go, 49J would have been required to make left turns before landing.

at 225.50, the Apache (the aircraft being piloted by plaintiff Van Gilder,) called the tower, stating that he was:

> "only about a mile from the end of the runway. I don't have the Cessna in sight. *He must be either right* [11] *under me or below me* or behind me." (Emphasis added)

At that point both Mr. Story and Mr. McCready (the monitor) directed their attention to the east. Almost immediately after this message, Mr. Story spotted a plane; at 226.04 he asked zero eight delta whether he was a twin Cessna.[12] At 226.07 zero eight delta responded affirmatively.

At this precise moment Mr. McCready had two twin-engine planes in sight, and it seemed to him that both planes might not be able to land safely on runway 27R at that time.

Mr. McCready also suspected that Mr. Story was unable to spot both planes. Accordingly, instead of wasting the time that might be required to get Mr. Story to see both planes and make a decision, Mr. McCready, the more experienced and senior controller, assumed control. At this point Mr. McCready was confronted with a problem which had not been fully apparent to him only seconds before: one plane, 49J, was about to make a left turn to execute a touch and go on 27L; two other planes, the 310 and the Apache,

were approaching 27R to land; [13] and all three planes might not be able to land safely at that time. From Mr. McCready's vantage point, the Apache appeared to be behind, above, and to the right of the 310. Consequently at that moment Mr. McCready had to choose from, among others, the following alternatives:

1. All three planes would be required to go around and none would be given clearances to land; [14]

2. 49J would be required to go around,[15] the Cessna would be given a clearance to land on 27L, and the Apache would be given a clearance to land on 27R; [16]

3. 49J would be required to go around, the Apache would be cleared to land on 27L, and the Cessna would would be cleared to land on 27R;

4. 49J would be cleared to land on 27L, the Cessna would be cleared to land on 27R, and the Apache would be instructed to go around; or

5. 49J would be cleared to land on 27L, the Apache would be cleared to land on 27R, and the Cessna would be instructed to go around; or

6. 49J would be cleared to land on 27L, and both the Apache and

---

11. As noted above, a plane one mile from the end of the runway would be about two miles from the control tower. At this time the Apache was in the haze and smoke, and approaching the control tower against the backdrop of the outlying hills.

12. The transcript of tape recorded tower conversations indicates that the Apache called in a mile from the end of the runway at 225.50 and Mr. Story communicated with zero eight delta at 226.04. However, this does not mean that fourteen seconds elapsed between the two messages. All times on the transcript refer to the time when a message begins. The Apache's message beginning at 225.50 took several seconds to complete.

13. As of this time, neither the 310 nor the Apache had been cleared by the tower to land. However, 49J had received a clearance to land on 27L.

14. For a pilot to "go around" means that he applies power to the aircraft prior to landing, so that it begins ascending, and climbs over the runway, re-entering the rectangular traffic pattern.

15. With respect to altering the flight path of 49J, Mr. McCready would have to choose between one of several different ways of accomplishing this result: 49J could be permitted to continue straight extending its downwind leg, to make a left 360° turn and re-enter the pattern, or to make a right 360° turn re-entering the pattern.

16. It should be noted that by giving the Apache and the 310 clearances to land, the controller was not ordering them to land; a clearance authorizes a pilot to land, but he is always free to go around if he concludes that the action is necessary.

Cessna would be instructed to go around.

Less than three seconds after 08D had acknowledged that it was a twin Cessna, and less than two seconds after Mr. McCready took over the controls, he made a decision. At 226.10 he instructed 49J to to make a right 360° turn. However, Mr. McCready was watching 49J and observed that it had begun a left turn. Accordingly, at 226.13, three seconds after his earlier instruction, Mr. McCready instructed 49J to continue the left turn and make a 360°, cleared the Apache to land on 27R and authorized the Cessna 310 to land on 27L or go around.[17]

After issuing this instruction, Mr. McCready saw the Cessna begin to make what seemed to be a left turn, and then concluded that the planes would land on the respective runways. He then turned his attention to two other planes in the traffic pattern, and at 226.30 authorized three three juliette (33J) to continue his approach and asked nine zero foxtrot (90F) whether he was abeam the old tower.

Shortly thereafter the two planes collided, apparently with the Apache coming down right on top of the 310, and then they crashed and exploded. Neither Mr. McCready nor Mr. Story saw the collision.

In the Cessna were two experienced pilots: Mr. Hamilton, who had about 20,000 hours of actual flight time, had been giving flying instructions at Oakland Airport for a considerable period of time, and was thoroughly familiar with the Oakland area; and Mr. Whitlow, who had over 2,000 hours of actual flight time, and who was taking upgrade training to become an airline transport pilot. Mr. Whitlow held a commercial pilot's certificate and an instrument rating, and had completed 50–75% of the ATR course.

In the Piper, Mr. Van Gilder has spent a lifetime of flying, having logged at least 10,500 hours; of this time 300 hours in multi-engine aircraft (included in this is logged 100 hours in a Cessna 310).

The basic issue to be decided by the court in this case is: what is the standard of ordinary care the control tower is held to and did the control tower operators fulfill their responsibilities in this instance. In this case it is the court's opinion that it is important to note that the accident occurred in VFR conditions, that the pilots were experienced pilots, that the runways being utilized are parallel runways, and that the Control Tower is located at a considerable distance from the threshold of the runways and the scene of the accident, it being over one mile in distance; that the tower controllers are looking and viewing incoming traffic to 27R and 27L against a backdrop of mountains, haze and smoke, and that experienced, informed and knowledgeable pilots having utilized this airport on prior occasions would be fully cognizant and aware of the difficulties and limitations facing controllers. Also, there was testimony by James Harris, a visibility expert, that there is a loss of depth perception of aircraft at a distance of one-half mile or more, imposing a limitation on the ability of controllers to gauge the relative positions of craft in VFR conditions, the aircraft being in a much better position to do this.

██ It must be emphasized at the outset that the focal point of ultimate responsibility for the safe operation of aircraft under VFR weather conditions rests with the pilot. Under such conditions he is obliged to see and avoid other traffic, even if he is flying with a traffic clearance. United States v. Miller, 303 F.2d 703, 710 (9th Cir. 1962).

As the court noted in *Miller*, it "would be erroneous" to conclude that "the controllers have the primary responsibility for controlling aircraft so as to prevent collisions".

17. The exact instruction reads as follows:
"Four niner juliette now continue in your left turn and make a three sixty four three papa cleared to land runway two seven right Twin Cessna zero eight delta make your approach two seven left or go around."

These elementary principles have been re-emphasized time and time again in numerous other decisions. E. g., United Air Lines, Inc. v. Weiner, 335 F.2d 379, 389 (9th Cir. 1964), cert. den., 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1965) ("responsibility for the separation of two aircraft flying in [VFR] weather, regardless of * * * air traffic clearance, rests directly upon the operating personnel of the respective aircraft"); United States v. Schultetus, 277 F.2d 322, 328 (5th Cir. 1960), cert. den., 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960) (pilot has "direct and primary responsibility" to "avoid a collision with another plane"); Tilley v. United States, 375 F.2d 678, 682–684 (4th Cir. 1967); Wenninger v. United States, 234 F.Supp. 499, 516–517 (D.Del.1964), affirmed, 352 F.2d 523 (3rd Cir. 1965); Stanley v. United States, 239 F.Supp. 973, 978–979 (N.D.Ohio, 1965); Hochrein v. United States, 238 F.Supp. 317, 319 (E.D.Pa. 1965); See Franklin v. United States, 342 F.2d 581, 584–585 (7th Cir. 1965), cert. den., 382 U.S. 844, 86 S.Ct. 51, 15 L.Ed.2d 84 (1966).

In light of these decisions, there can be no doubt that under VFR conditions the primary and ultimate responsibility for the safe operation of an aircraft rests at all times upon the pilots; the duties of the controllers, when they exist at all, are purely secondary. The reasons why this should be so are not difficult to perceive. The pilot's only responsibility is to operate his aircraft; a controller, by contrast, has to give clearances to, and attempt to keep track of, every plane in the control zone. Moreover, a pilot is in a far better position to look out for other traffic than the controller; as this case well illustrates, a pilot must be expected to see traffic which is close to him, but which may be miles distant from the controller. Finally, a pilot operates the plane, while a controller does not (save in rare instances) order pilots to perform specific maneuvers. There can be no doubt that each of the three plaintiffs was seriously deficient in exercising his primary and ultimate responsibility for the safe operation of an aircraft.

There was testimony by Mr. Raymond Yaeger, who is an Air Traffic Control Specialist with the FAA, and qualified as an expert, that there are no separation standards in VFR in flying in an airport traffic area. The only standards are runway separation, that once the tower determines the sequence of aircraft, it is not the tower's duty to control the distance between the aircraft. The contention of counsel for plaintiffs is that the controllers are responsible, in the sequencing of aircraft, for the distance separation, if the proximity of the aircraft requires it.

Although there was testimony that the service described in the Airman's Information Manual, 1–45, did not apply to the control of VFR traffic, even if it did, the result is that the pilot still provided his own distance separation, i. e., Paragraph 1 states:

"Visual separation is a means employed by ATC to separate aircraft in terminal area. There are two methods employed to effect this separation: (a) the tower controller sees the aircraft involved and issues instructions, as necessary, to ensure that the aircraft avoid each other."

However, it should be noted that Paragraph 1(B) states as follows:

"A pilot sees the other aircraft involved and upon instructions from the controller provides his own separation by maneuvering his aircraft as necessary to avoid it. This may involve following in-trail behind another aircraft or keeping it in sight until it is no longer a factor."

Also, Paragraph 5 states:

"Pilots should remember, however, that they have a statutory responsibility to see and avoid other aircraft when weather conditions permit (FAR 91.-67a), irrespective of whether this 'visual separation', per se, is being employed by the controller".

The FAA regulations specifically spell out the *numerical separation* on a run-

way with reference to arriving aircraft. Aircraft Control Procedures, Sec. 423 and following. Further, under VFR conditions, there is no numerical separation spelled out with reference to in-flight movement other than the use of general terms with reference to the movement of craft in flight as opposed to a minimum separation in flight of three miles when IFR standards are utilized. There was also testimony to indicate that the terminology "clear to land" means that the runway is clear. It does not refer to air space . . . . and the conditions that exist in VFR are such that the pilot is in a much better position to provide his own spacing than the tower.

■ It is interesting to note that 23 seconds after 43 papa (Piper piloted by Van Gilder) stated that "I don't have the Cessna in sight. He must be either right under me or below me or behind me", the Tower gave said 43 papa clearance to land on runway 27R, and the twin Cessna operated by Hamilton and Whitlow were ordered to make their approach on 27L or go around. This instruction by the Tower must be considered in the light of practicality—in that its meaning was that Van Gilder was cleared to land on 27R. In other words, *that* (runway 27R) was the runway he was authorized to utilize, and only he was so authorized, and that the Cessna was not to use 27R. The Cessna was to use *27L* or *go around.* The words "clear to land" used by the Tower in this instance did not mean, the court finds, that the planes in air had guaranteed distance separation, but merely was an indication to them of an allocation of runways to be utilized for landing purposes, and that any separation which was to be afforded was to be provided by the pilots themselves.

The court finds that the tower was not negligent in its duties and, therefore, the issue of proximate cause or contributory negligence of the plaintiffs, or each of them, would not normally be necessary; however, the court is compelled to comment upon the action of the pilots in the context of their negligence, which the court finds was the proximate cause of the accident.

After the initial contact with the tower at 218.45, the Cessna (Whitlow and Hamilton) had an obligation and responsibility to listen and maintain 2-way radio contact, together with monitoring the tower with reference to other traffic. Both the instructor, Pilot Hamilton, and the student pilot (the court having found that he was not under the hood at the time) had the responsibility for their separation and lookout.

If the Piper 43P (Van Gilder) thought he was in danger, and from the total circumstances of his location at that time, even though he had been given clearance to land, he should not have descended, but should have sought the safest route visible to him.[18]

As it has been noted, both Hamilton and Whitlow were experienced pilots who had a primary and ultimate responsibility for the operation of the aircraft. There can be no doubt that both pilots were under a duty to look out for other aircraft and to operate their aircraft carefully. See Neff v. United States, 136 U.S.App.D.C. 273, 420 F.2d 115, 120–122 (1969), cert. den., 397 U.S. 1066, 90 S. Ct. 1500, 25 L.Ed.2d 687 (1970); United States v. Miller, 303 F.2d 703, 708 (9th Cir. 1962), cert. den., 371 U.S. 955, 83 S.Ct. 507, 9 L.Ed.2d 502 (1963).

■ The actions and conduct of Hamilton and Whitlow must be considered in context with the presumption of due care exercised by them, because of human instinct of self-preservation and disposition of man to avoid personal harm; pilots killed in collision of aircraft were presumed to have acted with diligence and due care. Eastern Air Lines, Inc. v. Union Trust Co., 95 U.S.App.D.C. 189, 221 F.2d 62.

---

18. Witness Daniel Dent testified he was flying in the Oakland area and that he saw the mid-air collision. He stated "I heard it on the radio so I knew there was a lot of traffic in the air at that time." "I was scared because of the traffic around me so I slowed my plane." "I was looking for traffic."

There is some valid and credible evidence that the 310 probably executed a 360° turn just prior to the accident.[19] It appears that when the collision occurred, the 310 had either completed the turn and converged with the Apache which was descending from above, or was in the process of completing the turn and converged with the Apache from its side. In either event, the pilots of the 310 would have had a view of approaching traffic when they were half way through the 360° right turn, and Mr. Whitlow, who was sitting in the left seat, had an especially good view as the aircraft moved from half-way to three-quarters of the way through the turn. Needless to say, neither pilot maintained a proper lookout. That failure constitutes negligence as a matter of law.

It should be noted, however, that the 310 pilots would be negligent as a matter of law whether or not they executed a 360° right turn. Pilots have a duty to maintain a vigilant lookout, especially when in a control zone, irrespective of their particular maneuver. There is no possible basis upon which the pilots of the 310 can contend that they performed that duty.

United States v. Miller, supra, 303 F.2d 703, is directly in point and its facts are remarkably similar to the facts here. In that case a Beechcraft piloted by Miller was descending in a turning left bank of about 10° to 15°; it collided in mid-air with a Cessna, from the Cessna's left, as the Cessna had almost completed a right turn. The district court found the air traffic controller (who could have seen the aircraft for about 18 to 24 seconds prior to the crash, had he looked up) negligent in eight different respects, and found that Miller was not contributorily negligent. The Ninth Circuit unanimous-

ly reversed, and held that Miller was contributorily negligent *as a matter of law.*

The court's language is especially pertinent here. In concluding that Miller was contributorily negligent, the court began by noting that, even if sighting the Cessna was made difficult by a camouflage effect in the background, Miller "would have to look thoroughly and diligently in the area in which the Cessna was flying." Id. at 708. The court then stated that (id.):

> "Miller knew, or should have known, that the greatest likelihood of conflicting traffic would come from the precise area in which the Cessna was flying. He should have anticipated the possibility of aircraft on the crosswind leg of the traffic pattern, and should have made a thorough surveillance of that area his prime concern."

In this case, of course, Hamilton and Whitlow knew (or should have known) that the greatest likelihood of conflicting traffic would come from the precise area in which the Apache was flying. They should have made a thorough surveillance of this area their prime concern, but did not.

It is worth stressing that in *Miller* the pilot may have been unable to see the Cessna because his plane was descending in a turning left bank. But the Ninth Circuit held that this would not affect the fact that Miller was contributorily negligent as a matter of law. As the court stated (id. at 709; emphasis added):

> "This is not a condition beyond the pilot's control; *all that was required to remove this limitation was a momentary bank or a roll in the opposite direction.* * * * Miller * * * cannot relieve himself of the duty to observe this traffic by voluntarily

19. Witness Charles Weatherton was in his office facing a large window and was looking out. He said he saw two aircraft, one was on straight in approach, and the other was coming in from the north making a turn—coming down the base leg to make its turn, the turning craft came into a straight in approach and crash at approximately an 80° angle to the craft on original straight in. "From the time I first saw them one was in a turn . . . ." There was other testimony by other witnesses of a possible turn, while others only saw the planes as they were lined up for straight in approach, shortly before the accident.

placing an obstruction in his line or sight."

In light of *Miller*, there is no room for any argument that Hamilton and Whitlow were not negligent. They had an opportunity to see the Apache, but negligently failed to do so. And to the extent that their vision may have been obstructed by the fact that they were banked in a turn, "all that was required to remove this limitation was a momentary bank or roll in the opposite direction." Id.

■ It is stressed again that under *Miller* plaintiffs must be held negligent. However, Hamilton and Whitlow were negligent in several other respects. For purposes of the discussion which follows immediately, we will assume that the 310 did not make a 360° right turn.

First, the pilots were negligent per se in violating 14 C.F.R. 91.65(a) which prohibits the operation of "an aircraft so close to another aircraft as to create a collision hazard." Here, unfortunately, the operation of the 310 created not only the hazard of a collision but an actual collision.

Second, the pilots failed to acknowledge three separate requests for a location report from the tower. This failure constitutes nothing less than gross and hazardous negligence. Any pilot should know that, when a controller requests a location, it probably is because he does not know the plane's location. In order to perform his function the controller must assume compliance with instructions. The tower relies upon accurate positioning reports. Without accurate position reports, under circumstances where pilots fail to comply with instructions, it is impossible to properly sequence numerous aircraft for landing.

Third, the pilots either failed to monitor their radio or failed to pay attention to a report by the Apache.[20] At 223.54 the Apache reported in on the 27 localizer 5 DME miles out and was cleared to make a straight in approach. The pilots were therefore put on notice that an Apache would be approaching the runway from the east. They should have looked "thoroughly and diligently" in that area, "and should have made a thorough surveillance of that area [their] prime concern." Miller v. United States, supra, 303 F.2d 708.

Fourth, the pilots of the 310 may have violated a basic right of way rule by cutting in front of the Apache. See 14 C.F.R. 91.67(f).[21]

■ However, if the pilots of the 310 made a 360° right turn then they will have been negligent in several additional respects, as follows:

First, the pilots were negligent in not reporting to the control tower upon crossing two mile final. By so doing they failed to comply with the controller's express instruction to do so, in violation of 14 C.F.R. 91.75(b).[22]

Second, making a 360° right turn constituted a patent (and potentially hazardous) deviation from the 310's clearance to conduct a straight in approach, and was in violation of 14 C.F.R. 91.75(a).[23]

Third, the pilots failed to notify the control tower of their deviation from the clearance, in plain violation of 14 C.F.R. 91.75(c).[24]

---

20. Witness V. Simmons stated that it was customary for pilot-trainee and instructor to monitor the radio—so that they can both analyze the traffic conditions in the interest of safety.

21. Under 91.67(f), "[W]hen two or more aircraft are approaching an airport for the purpose of landing, the aircraft at the lower altitude has the right of way, but it shall not take advantage of this rule to cut in front of another which is on final approach to land, or to overtake that aircraft." (Emphasis added).

22. Under 91.75(b), "[E]xcept in an emergency, no pilot may, in an area in which air traffic control is exercised, operate an aircraft contrary to an ATC instruction." Certainly no emergency existed when the 310 first crossed the two mile final.

23. Under 91.75(a), "no pilot in command may deviate from [a] clearance, except in an emergency."

24. Under 91.75(c) "[e]ach pilot in command who deviates, in an emergency,

Fourth, if the 310 was in a 360° turn when the tower called it three times, it clearly would have been departing from its clearance, and its failure to answer the control tower in these circumstances would go beyond ordinary negligence and constitute something akin to wanton and willful misconduct.

Fifth, the pilot then in command may have reported inaccurately when at 225.06 he stated that he was coming upon the freeway. It would seem that the 310 would be either north or well west (i. e., inside) of the freeway when he reported.

Sixth, as noted above, the pilots may have violated a right of way rule by cutting in front of the Apache. See 14 C.F.R. 91.67(f).

Seventh, further negligence of the student-pilot Whitlow:

1. If the Cessna 310 was making a 360° turn, the testimony was that the student-pilot (Whitlow) *would not* be under the hood, therefore he had a responsibility to look;[25] or

2. If a straight in approach, then there was no evidence of the fact that this was an instrument landing approach (so that Whitlow would be under the hood) as there is testimony the instrument landing approach information would be on an approach control tape, and, therefore, he (Whitlow) was not under the hood and had a responsibility to look.[26]

■ All of the considerations discussed above with respect to Hamilton and Whitlow apply with equal force to Van Gilder. He was an experienced pilot flying in a traffic control zone; as such he had the primary and ultimate responsibility for keeping a look-out and for the safe operation of his aircraft.

When Van Gilder entered the traffic control zone (and even before that) he had a duty to look "thoroughly and diligently in the area in which" the Cessna was flying. Miller v. United States, supra, 303 F.2d 708. Indeed, Van Gilder must have heard the 310 report that it was coming up on the freeway and he was warned by the controller to look for the Cessna in that area. Thus Van Gilder "knew, or should have known, that the greatest likelihood of conflicting traffic would come from the precise area in which" the 310 was flying. His failure to keep a proper look-out, under the authority of *Miller*, is deemed negligence as a matter of law.

It is no answer to state that Van Gilder might not have been able to see the 310 just prior to the crash. "This is not a condition beyond the pilot's control." *Miller*, supra, 303 F.2d 709. Van Gilder "should reasonably have anticipated conflicting traffic" in the area of the 310; "he cannot relieve himself of the duty to observe this traffic by voluntarily placing an obstruction in his line of sight." Id.

First, as with Hamilton and Whitlow, Van Gilder was negligent per se in operating his "aircraft so close to another aircraft as to create a collision hazard." 14 C.F.R. 91.65(a).

Second, Van Gilder was negligent in not observing the 310 after he approached the control zone. On his approach course, Van Gilder had an excellent opportunity to monitor any traffic in his entire field of vision—including traffic in precisely the area where the 310 probably was flying. In addition, he should have been aware, from monitoring the radio, that the control tower was having difficulty in visually locating zero eight delta. This should have further alerted

from an ATC clearance or instruction shall notify ATC of that deviation as soon as possible."

25. A hood is a head piece utilized by a student-pilot that restricts his visibility and enables him to concentrate more easily

on the instrument panel of the craft he is piloting.

26. Witness Simmons testified that it was mandatory that the pilot-instructor notify Approach Control that the student is making an IFR landing under the hood at VFR conditions.

Van Gilder to the fact that a vigilant look-out would be required. But he did not keep such a look-out.[27]

Third, when the 310 called the tower stating it was coming up on the freeway, Van Gilder clearly should have exercised extra care and intensified his look-out. This would be so whether or not the tower had warned him of the 310 as traffic. See Tilley v. United States, supra, 375 F.2d 683. But at 225.17, shortly after the 310 reported at the freeway, the tower gave Van Gilder *express information* that the 310 had reported in the area of the freeway.[28] There is, therefore, no possible excuse for Van Gilder's not having maintained the look-out that would be required to see the 310.

Fourth, Van Gilder was negligent in not having taken evasive action once he concluded that the 310 was right under him or right behind him. At 225.50 Van Gilder stated to the tower that he couldn't see the 310 and that "he must be right under me or below me or behind me." At that point, Van Gilder knew that there was a substantial possibility that the 310 was right under him. Instead of continuing his rapid descent as he did, Van Gilder should have applied power and gone around. Had he done so, the accident would not have occurred.

It is no answer for Van Gilder to state that he may not have applied power because he was given a clearance to land on runway 27R. If he had any doubt about the safety of such a course, he should have applied power. Indeed, Van Gilder should have known that there

would be little danger involved in going around, but a great deal of potential danger involved in continuing his steep descent.[29] We stress again that the primary responsibility for avoiding mid-air collisions rests upon the pilots. Van Gilder "was required to follow his clearance, not blindly, but correlative with his duty to exercise care for his own safety from everything of which he was aware." Hochrein v. United States, 238 F.Supp. 319. As the Fifth Circuit stated in United States v. Schultetus, supra, 277 F.2d 328:

> The tower operator was entitled to believe that the operator of the [plane] would, in the exercise of his direct and primary responsibility, avoid a collision with another plane, the presence of which he had acknowledged.

A pilot making a straight in approach must realize that this is a more dangerous type of approach (as contrasted with a pattern approach) even though the pilot is given a "clearance to land", he still has the duty to see and avoid.

Finally, Van Gilder was negligent because he denied the 310 the right-of-way in violation of 14 C.F.R. 91.67(f). That regulation provides that "[w]hen two or more aircraft are approaching an airport for the purpose of landing, the aircraft at the lower altitude has the right of way." Since the Apache came down on top of the 310, the 310 was the plane with the right-of-way at that point. Van Gilder's failure to yield to the 310 the right-of-way was a further instance of negligence.

In summary, it is the finding of the court that the control operators were

---

27. Van Gilder may have been negligent in another respect. When he was 5 DME miles from the tower, he was at an altitude of about 4000 feet. A normal approach altitude at that point would be closer to 2000 feet. This means that Van Gilder was considerably higher than the normal plane on a straight in approach, and this high altitude may have affected the inability of the pilots in the 310 (and of the tower) to see him. This means also that his rate of descent,

if constant, was twice the normal rate of descent.

28. The precise warning was: "Four three papa Oakland Tower traffic Cessna reported approaching freeway on two mile final over."

29. 14 C.F.R. 91.3(b) provides that "[i]n an emergency requiring immediate action, the pilot in command may deviate from any rule * * * to the extent required to meet that emergency." See 14 C.F.R. 91.75(a).

not negligent in the exercise of their functions and duties.

At the time of the accident, the traffic in the control zone was moderate to heavy, requiring the controllers to keep track of numerous aircraft. As noted above, after the 310 reported over Castro Valley, the tower communicated with eleven different aircraft. In spite of the need to communicate with and keep track of these aircraft, the controllers did not forget about the 310. Instead, commencing at shortly after the time the 310 could be expected to cross two mile final, Mr. Story made *three* separate attempts to contact the 310, but the 310 failed to respond. It was hardly the controllers' fault that they could not locate an aircraft which failed to report its position.

When the 310 ultimately did report coming up on the freeway, Mr. Story cleared it to continue its approach to runway 27R. And, as if to make absolutely certain that the 310 and the Apache would not get dangerously close to each other, he told the Apache that the 310 was in the area of two mile final. It is difficult to imagine anything more that the controllers could have done. Of course, hindsight is always more accurate than foresight under the circumstances. It is true that at this point neither controller saw the two airplanes. But the fact remains that the area to the east contained smoke and haze and that the planes were approaching against the background of the outlying hills.

When the Apache called in at about a mile from the end of the runway, the controllers were confronted with the task of attempting to spot two planes in the distance. It cannot be over-emphasized that at that point the planes were about two miles from the control tower, a substantial distance away. It should not be overlooked, either, that the Apache did not report on two mile final. Thus, when the Apache called at one mile from the end of the runway, the controllers had to attempt to spot two planes—one which had been cleared to continue a straight in approach, and another which had not.

Also, it is important to note again that we have a case of parallel runways, not the situation of a single runway.

Shortly thereafter, when Mr. McCready, the senior controller, spotted both planes, he had to choose between one of at least six possible decisions. (See supra, P. 8–9) Mr. McCready made a decision in a matter of seconds and executed it well. He ordered 49J to make a right 360° turn, thus clearing both runways for the incoming planes. He then cleared the Apache to land on 27R and the 310 to land on 27L. It is difficult to understand the basis upon which it can be claimed that in the circumstances this decision was unreasonable. Both of defendant's expert witnesses, Arlis Buttler, the pilot expert, and Raymond Yeager, the controller expert, testified that the instructions given by the tower under the circumstances of this case were proper and followed the usual and common practice.

After he saw one of the aircraft beginning to make a turn, Mr. McCready shifted his attention to other planes in the control zone. By so doing he was not violating a duty to either the pilot of the Apache or the pilots of the 310. For as the Seventh Circuit stated in Franklin v. United States, 342 F.2d at 585, an air traffic controller

is not supposed to give his attention to any one aircraft in the control zone if other aircraft are present. All aircraft within the control zone should have the controller's attention.

This court finds that plaintiffs have not established by a preponderance of evidence the allegations for which they bear the burden.

The court concludes, therefore, that judgment should be rendered in favor of defendant and against plaintiffs upon the issue of liability, and that defendant shall be entitled to its costs.

The court having concluded that the tower operators were not negligent, the

question of defendant's liability to plaintiffs Lewis and Clark Trading Co. (the purported owners of the Cessna 310 being operated by Hamilton and Whitlow) becomes moot, as no such liability would exist. Judgment is therefore rendered in favor of the defendant, United States of America, against plaintiffs Lewis & Clark Trading Co., and H. J. Stockman, doing business as Lewis & Clark Trading Co., and defendant is entitled to its costs.