**MANAGEMENT ACTIVITIES, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Nos. CV 94–8313 JMI (CTx), CV 95–0144 JMI (CTx), CV 95–5540 JMI (CTx), CV 95–5542 JMI (CTx) and CV 95–5946 JMI (CTx).**

United States District Court, C.D. California.

Sept. 11, 1998.

---

Garry L. Montanari, Gary LaPook, Wesley S. Wenig, Westlake Village, CA, Law firm: Michaelis, Montanari & Johnson, P.C., for plaintiff.

Robert J. Gross, Trial Attorney, Steven J. Riegel, Senior Aviation Counsel, Washington, DC, U.S. Department of Justice and Mark B. Baylen, Federal Aviation Admin., for defendant.

## ORDER

IDEMAN, District Judge.

**IT IS HEREBY ORDERED:**

### FOREWORD

This Order will dispose of litigation arising from a plane crash at John Wayne Airport in Orange County in December 1993. Succinctly put, a Westwind business jet with five people aboard · encountered the turbulence created from a United commercial jet landing ahead of the Westwind. The Westwind crashed, killing all five people aboard. This action against the Government claims negligence on the part of FAA Headquarters as well as negligence by the Air Traffic Controllers at or near John Wayne Airport.

As will be seen, this Court concludes in Part III of this Order that the doctrine of Discretionary Function bars action against FAA Headquarters. The Court further concludes in Part IV that the Plaintiffs have failed to prove negligence on the part of any or all of the Air Traffic Controllers at or near John Wayne Airport.

As a result of these findings, this Court GRANTS Judgment for the Government.

### I. INTRODUCTION

This litigation arises from an aircraft accident at John Wayne Airport, Santa Ana, California, on December 15, 1993, at 1733:18 Pacific Standard Time, involving an Israel Aircraft Industries Westwind II business jet ("Westwind"), Federal Aviation Administration ("FAA") registration number N309CK. At 0700 hours on the day of the accident, the Westwind departed· Long Beach Airport to begin a multileg operation. After several intervening stops during the day, the aircraft

arrived at Brackett Field, located in the northeast area of the Los Angeles basin, north of Pomona, California. In late afternoon, the Westwind crew prepared for the short 35–mile flight from Brackett Field to John Wayne Airport. They filed an Instrument Flight Rules ("IFR") flight plan, and obtained an instrument clearance from air traffic control ("ATC"). The Westwind was attempting to fly a visual approach to Runway 19–Right (19R) when it encountered wake turbulence from a preceding United Airlines Boeing 757 ("Boeing 757"), lost control, and crashed approximately 3.2 miles short of the runway. Both pilots and all three passengers aboard the Westwind sustained fatal injuries in the crash.

The Westwind was owned by Management Activities, Inc. ("MAI"), Long Beach, California, and jointly operated by MAI and Martin Aviation ("Martin"), Santa Ana, California, pursuant to a joint venture agreement. Martin is located at John Wayne Airport and is known in the aviation industry as a fixed-base operator.

The flight was an air-taxi passenger flight, operating under the provisions of 14 C.F.R. Part 135, and was transporting three corporate executives as passengers (Richard Snyder, Philip West and Jack Sims). The Westwind was flown by two professional pilots: Captain Stephen Barkin and Co-pilot John McDaniel. Mr. Barkin was employed by MAI and was acting within the scope and course of his employment. Mr. McDaniel was employed by Martin and was acting within the scope and course of his employment. In addition, both pilots held an airline transport pilot certificate, the highest pilot rating issued by the FAA, and were qualified to serve as Captain of the Westwind.

In the three months leading up to the crash, both Mr. Barkin and Mr. McDaniel had piloted the Westwind on numerous occasions into John Wayne Airport. Both pilots were very familiar with the Westwind aircraft and with John Wayne Airport.

## II. PROCEDURAL HISTORY

This action against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), was tried before this Court over a 25 day period, beginning on October 28, 1997 and concluding on September 8, 1998. A total of nine cases have been consolidated in this action seeking damages against the United States for wrongful death and loss of property. Several of the cases were originally filed in state court against MAI and Martin. When MAI and Martin cross-claimed against the FAA in each suit, the actions were removed to Federal Court by the United States and eventually consolidated in this Court. All of the claims have been settled, except those brought by MAI/Martin against the United States.

■ Defendant's Motion to Dismiss Certain Claims for Lack of Subject Matter Jurisdiction came before this Court for review on July 1, 1996.[1] In said motion, the United States argues that this Court lacks subject matter jurisdiction to hear certain claims relating to the alleged negligence of the FAA Headquarters, because such claims challenge discretionary functions for which the United States has not waived its sovereign immunity. 28 U.S.C. § 2680(a). At that time the Court denied the motion to allow further factual development of the case to proceed. The Court initially divided the trial into phases and set the following order of presentation of evidence:

1. 757 Wake characteristics;
2. FAA Headquarters Negligence;
3. Air Traffic Controller Negligence;
4. Pilot or Aircrew Negligence;
5. Company Negligence; and
6. Damages.

Shortly after opening statements, the Court revisited the discretionary function issue as it relates to the FAA Headquarters alleged negligence. The Court ordered the parties to submit briefs that discuss the dis-

---

1. That motion should have been refiled as a motion for summary adjudication. In ruling on a jurisdictional motion involving factual issues which also go to the merits, the court should employ the standard applicable to summary judgment. *See Augustine v. United States,* 704 F.2d 1074 (9th Cir.1983). Accordingly, Defendant filed the present motion for summary judgment.

cretionary function doctrine in greater depth and this phase of the case was taken under submission. With respect to the FAA Headquarters Negligence phase, Defendant moves to dismiss all claims relating to the alleged negligence of the FAA Headquarters in classifying the aircraft weight category of the Boeing 757 aircraft, in formulating standards for the separation of aircraft, in failing to provide certain additional training to air traffic controllers and warning to the aviation community about the alleged increased hazards of wake vortices created by the Boeing 757, and in failing to undertake and supervise research concerning 757 wake turbulence.

With respect to the alleged Air Traffic Controller Negligence phase, the parties completed presentation of their arguments and materials during the 25 day Court trial.

Accordingly, the Court will address the issues presented with regard to the alleged FAA Headquarters Negligence and Air Traffic Controller Negligence.

## III. DISCUSSION

### A. LIABILITY OF FAA HEADQUARTERS

#### 1. Discretionary Function Doctrine

The United States moves for summary adjudication of negligence claims against the Federal Aviation Administration ("FAA") Headquarters, arguing that those claims are barred by the discretionary function exception to the Federal Tort Claims Act. Pursuant to Federal Rule of Civil Procedure 78 and Central District of California Local Civil Rule 7.11, the Court dispensed with formal oral argument on the motion, and the Court took the motion under submission. The Court and counsel discussed the motion, on the record, during a number of in-chambers conferences during trial. After careful review, considering all pertinent papers on file, the arguments, and materials presented by the parties, the Court hereby GRANTS summary adjudication in favor of the United States on claims of FAA Headquarters negligence. The Court finds that the discretionary function exception to the Federal Tort Claims Act shields the United States from liability for alleged negligence on behalf of FAA Headquarters.

The discretionary function exception is applicable only to the claims alleging FAA Headquarters' negligence. Pursuant to Central District Local Rule 9.8 and this Court's Order Re: Preparation for Pre-trial Conference, the Parties lodged a Joint Pre-trial Conference Order. The local rules state that the Pre-trial Conference Order shall control the subsequent course of the action and supersedes the pleadings. The first five claims in the Pre-trial Conference Order address negligence at the FAA Headquarters' level and state in pertinent part:

1. The FAA failed to warn the aviation community of known dangers of B–757 wake turbulence;

2. The FAA negligently failed to change the wake turbulence classification and separation standards as it committed to do in 1990;

3. The FAA failed to follow its commitment to update advisory and educational materials to alert pilots of the known dangers;

4. The FAA was negligent per se in violating 49 U.S.C. § 44505 and failing to develop systems and procedures to address the known hazards created by the B–757; and

5. The FAA was negligent per se in violating its own Order 1000.1A which required that the agency assume to implement safety improvements before incidents occur.

The above-listed claims fall within the scope of the present motion for summary adjudication with respect to FAA Headquarters negligence.

#### 2. Standard for Summary Judgment

A motion for summary judgment provides a procedure for terminating without trial actions in which "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). It is the moving party's burden to show the district court that there is an absence of essential evidence to support the opposing party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must view the evidence presented in the motion in the light most favorable to the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Id.* at 249–255, 106 S.Ct. 2505.

There is no absolute right to a summary judgment in any case. The court has discretion to deny summary judgment wherever it determines that justice and fairness require a trial on the merits. *Id.*

■ When the United States moves for summary judgment, claiming that the plaintiff's causes of action are barred by the discretionary function exception, the United States has the burden of proving the applicability of the discretionary function exception. *Prescott v. United States,* 973 F.2d 696, 702 (9th Cir.1992).

For the purpose of this motion only, the Court accepts as true, the disputed allegation that the B–757 produces extraordinary wake turbulence.

### 3. Discretionary Function Exception

The FTCA authorizes suits in tort against the federal government in cases where a private citizen would be liable for the same tortious conduct. 28 U.S.C. §§ 2671–2680. Likewise, the FTCA grants jurisdiction for district courts to hear such suits. 28 U.S.C. § 1346.

The discretionary function exception is a qualification on the federal government's general waiver of sovereign immunity for tort claims and is explicitly codified within the Federal Tort Claims Act ("FTCA"). The exception is an outgrowth of the doctrine of separation of powers, which is integral to the orderly operation of the federal government. *See Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). In waiving sovereign immunity, Congress needed to guard against unnecessary judicial meddling in legislative and executive policy decisions. The discretionary function exception delineates the boundary between Congress' willingness to impose tort liability upon the United States and its desire to shield certain activities from private causes of action. *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Air-*

*lines),* 467 U.S. 797, 808, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).

Pursuant to the exception, the government retains sovereign immunity from suit for "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

#### a. Test for Applying the Discretionary Function Exception

■ The Supreme Court has formulated a two-step procedure to guide courts in determining whether conduct falls within the discretionary function exception. *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). First, a court must consider whether the challenged conduct is a matter of judgment or choice, or whether the conduct is specifically prescribed by a federal statute, regulation or policy. *Id.* The Ninth Circuit requires that a plaintiff show that the government violated a specific and mandatory standard for the discretionary function exception to be deemed inapplicable. *Kennewick Irrigation Dist. v. United States,* 880 F.2d 1018, 1027 (9th Cir.1989).

■ Second, if the challenged conduct involves a matter of judgment, a court "must determine whether that judgment is the kind that the discretionary function was designed to shield." *Id.* Under the second step of the procedure, the discretionary function exception protects from liability government decisions and actions based on decisions grounded in social, economic and political policy. *Id.* at 537.

#### 4. Claims For Alleged Headquarters FAA Negligence

■ Title 49 U.S.C. § 44505 requires the FAA administrator to maintain a "safe and efficient" air traffic control system. Plaintiffs assert that the FAA did not do so because of its failure to warn of B757 wake hazards and failure to modify Instrument Flight Rules ("IFR") approach separation standards. The first question is whether a

statute or regulation mandates that the FAA give such a warning or make the proposed change to separation standards. *See Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954.

█ At the time of the accident, the FAA had a specifically prescribed policy of providing wake vortex information and training, and policy for setting separation standards. However, no specific directive required the FAA to take the particular actions proposed by Plaintiffs. The mere presence of a statute will not deprive the federal agent of discretion and "[a] general statutory duty to promote safety would not be sufficient..." *Kennewick,* 880 F.2d at 1026–27. The statute cited by the Plaintiffs in the pretrial order is not a mandatory directive that commands specific conduct. 49 U.S.C. § 44505. Likewise, the language of FAA Order 1000.1A sets forth general policy and an organizational mission statement, but does not mandate particularized conduct. The Supreme Court has held that the FAA's statutory duty to promote safety is broad and discretionary. *See Varig,* 467 U.S. at 808, 104 S.Ct. 2755. Thus, the FAA's decision not to warn of B757 wake turbulence was a matter of judgment under the first step of *Berkovitz.*

█ Second, the Court must consider whether the decision not to warn was of the type grounded in social, political or economic policy. The issue is not whether the government agency or official actually balanced social, economic or political considerations, but whether the actions "are susceptible to policy analysis." *United States v. Gaubert,* 499 U.S. 315, 326, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991).

In the present case, Plaintiff contends that the FAA should have warned of the alleged extraordinary turbulence, educated air traffic controllers, and altered the IFR separation standards. The prioritization of aviation risks to emphasize and guard against is clearly the type of decision that is a matter of FAA policy. In the field of aviation there is an infinite number of potential risks. The FAA has the responsibility of determining how to allocate its resources to best operate the air traffic system. Furthermore, the FAA is charged with operating a system that

is both "safe and efficient." 49 U.S.C. § 44505.

It is theoretically and practically impossible for the FAA to maximize both safety and efficiency. The agency could maximize either one, or the other. In many circumstances, the interests of safety and efficiency conflict. Therefore, the Court construes the statute to require the FAA to balance these two goals. In deciding not to take the actions proposed in Plaintiff's five claims against Headquarters FAA, the FAA officials exercised discretion on a matter that is susceptible to policy analysis.

In *ARA Leisure Services v. United States,* 831 F.2d 193 (9th Cir.1987), a tour bus operated by a subsidiary of ARA Leisure Services went off a road in Denali National Park and rolled over, killing five passengers and injuring twenty-five others. In assessing the government's liability, the court found that the decision to design and construct the road without guardrails was grounded in social and political policy even though the rails served a safety function. *ARA Leisure Services,* 831 F.2d at 195 (9th Cir.1987). *See Dalehite v. United States,* 346 U.S. 15, 38–42, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) (holding that alleged negligence in manufacture of fertilizer fell within exception because manufacturer followed specifications and plans adopted as policy matter with exercise of expert judgment). However, the Court did not agree that the failure to maintain the road in safe condition was a decision grounded in social, economic, or political policies since (1) there was no clear link between Park Service road policies and the condition of the road, and (2) Park Service maintenance work was not the kind of regulatory activity that the Supreme Court singled out in *Varig Airlines,* 467 U.S. 797, 104 S.Ct. 2755. *ARA Leisure Services,* 831 F.2d at 195.

In this case, no such distinction can be made. All of the alleged omissions by Headquarters involved decisions that involve policy considerations. Unlike the situation in *ARA Leisure Services,* the question of what to do about possible B757 hazards necessarily involves both policy and safety in each discretionary decision. The road safety rails

and road surface maintenance are distinct. Because of the high degree of integration and regulation in licensing, training, controlling traffic, and certifying aircraft, aviation safety decisions are not so easily isolated. They are policy decisions that have political, economic, and social ramifications. Therefore, all of the claims against Headquarters involve decisions that are protected by the discretionary function exception.

### Failure To Warn of Specific Known Dangers From B757 Wake Vortex

Plaintiff argues that the discretionary function exception to the FTCA does not apply because the failure to warn of B757 wake turbulence was a matter of safety, not a matter of policy. Plaintiff contends that the first claim against Headquarters, that the FAA failed to warn the aviation community of known dangers of B757 wake turbulence, is simply a matter of safety and is not shielded by the discretionary function exception.

The Ninth Circuit has held that a decision not to warn of a specific, known hazard for which the acting agency is responsible is not the kind of broader social, economic, or political policy decision that the discretionary function exception is intended to protect. *Sutton v. Earles,* 26 F.3d 903, 910 (9th Cir. 1994). The FAA could not simply acknowledge a potential threat and do nothing more without impacting social, economic, and political policy concerns. Once the FAA warned of the threat the FAA would have to take some sort of corrective action. While the simple act of warning the aviation community may or may not fall within the exception, the ensuing corrective actions that would follow are necessarily policy decisions.

In *Sutton v. Earles* a pleasure boat collided with a Navy mooring buoy, killing a number of passengers and injuring others. The Navy failed to enforce statutory permit requirements for private vessels in the Navy waterway, failed to illuminate the hazardous buoy, and failed to post the speed limit. *Id.* The Ninth Circuit held that the omissions with regard to the speed limit and illumination were not protected by the discretionary function exception because they were not economic, social, or political policy decisions of the type that Congress intended to protect.

But the Ninth Circuit found that the Navy's decision not to dedicate resources to enforcing the permit requirement fell within the discretionary function exception. In addition to the economics of managing the permit system, the Navy would have faced the political fallout from forcing local boaters to comply. The court likened the Navy's decision to that of FAA's decision to conduct "spot-checks" instead of comprehensive checks when certifying aircraft. *Id.* at 909 (citing *Varig Airlines,* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984)). In *Varig Airlines,* the Supreme Court stated that the discretionary function exception "plainly was intended to encompass the discretionary acts of the Government acting in its role as regulator of the conduct of private individuals." *Id.* at 813, 104 S.Ct. 2755. The Court added, "When an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind." *Id.* at 819–20, 104 S.Ct. 2755.

When the allegations of failure to warn implicate the balancing of permissible social, economic, and political policies, the discretionary function exception applies. *See Dalehite v. United States,* 346 U.S. 15, 36, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). The FAA's decision not to warn, or to merely wait to warn, of the alleged dangers of the B757 was inextricably linked to other matters of policy that involve social, economic, and political implications.

In *Sutton v. Earles,* the Navy could have posted the speed limit, and illuminated the buoy, without enforcing the permit requirement. However, in running a coherent air traffic system, the FAA's decision to acknowledge and warn of a hazard cannot be separated from the necessary remedial actions that must follow. The FAA could not simply hang a sign in the sky warning of potential B757 hazards. In different circumstances, failing to warn of a known dangerous condition is separate and distinct from failing to correct the known dangerous condition.

For instance, in *Faber v. United States,* 56 F.3d 1122 (9th Cir.1995), the plaintiff was rendered quadriplegic when he dove from a

waterfall in the Coronado National Forest. Reversing the trial court's summary judgment for the United States based on the discretionary function exception, the Ninth Circuit held that "a failure to warn involves considerations of safety, not public policy." Id. at 1125. The court pointed out that the question of adequate warning does not typically relate to broad public policy. Id. In Faber, the Defendant Forest Service was subject to a "June 1986 plan [which] focused on solving specific known safety hazards through the implementation of three unambiguous directives." Id. at 1127. Under the plan, the Forest Service had no discretion to balance considerations. Under the plan, the Forest Service had posted signs to warn of some dangers, but failed to post a sign at the waterfall, which had been identified as a significant danger to park patrons.

The present case is unlike Faber in that Faber dealt with a natural condition, for which it would be impossible or absurd to take remedial action. Whereas, for the FAA, which tightly regulates the behavior of those operating in the air traffic system, the decision to warn is inseparable from the decision to remedy.

Based on the foregoing, The Court finds that the alleged negligent actions or inaction on the part of Headquarters FAA was a matter of judgment and a matter of policy such that the discretionary function exception shields the United States from liability. Accordingly, the Court hereby GRANTS summary adjudication in favor of the United States on the claims alleging Headquarters FAA negligence.

## IV. LIABILITY OF AIR TRAFFIC CONTROLLERS

### A. FINDINGS OF FACT

#### a. WESTWIND SPEED

The Plaintiffs allege the ATC were negligent in failing to issue a speed restriction to the Westwind prior to its handoff to Coast TRACON. However, the Court adopts the following findings of fact submitted by the Defendants, finding the ATC acted in accordance with all applicable procedures and were not negligent in failing to issue a speed restriction.

At 1724, the Westwind took off from Brackett Field on its final flight. As an "IFR" flight, the crew was required to stay in constant communication with air traffic controllers. After takeoff, the Westwind contacted the Ontario TRACON and received radar vectors towards John Wayne Airport for the short flight. The final cruise altitude was 4000 feet above Mean Sea Level (MSL). The flight duration was very short, lasting only nine minutes from takeoff at Brackett Field to the crash just short of the runway at John Wayne Airport. The flight occurred at night in beautiful weather conditions, with clear skies and excellent visibility.

At 1727:42, the flight crew received "Information Zulu" from the Automated Terminal Information Service (ATIS) [2] at John Wayne Airport. The recorded information on the ATIS included the following:

a) the weather at John Wayne Airport was "clear";

b) the visibility was "thirty" miles;

c) the winds were "200 degrees at 5 knots;" and

d) "ILS 19–Right [and] visual approaches in use."

At 1728:06, the Ontario TRACON controller instructed the Westwind to contact the Coast TRACON controller.

There is a "letter of agreement" between Ontario Approach and Coast Approach which deals with certain aspects of inter-facility handoffs, but the document is not comprehensive of all situations and circumstances. The letter of agreement states that aircraft flying on the same route as the Westwind shall be handed off from Ontario TRACON to Coast TRACON at 4000 feet with a speed restriction of 210 knots.

The Westwind was not issued a speed restriction of 210 knots by the Ontario TRACON controller. However, this was not a deviation from the provisions of the letter of agreement because at the time of the handoff the Westwind was not level at 4000 feet: it

---

**2.** The ATIS is a continuous, repetitive tape recording broadcast on a specific radio frequency which pilots tune in to receive current, routine information about the airport, the current weather, approaches in use, etc.

was still climbing through 3700 feet on its way to 4000 feet. Therefore, the Westwind was considered a "departure."

A provision of the Air Traffic Control Handbook, FAA Order 7110.65H (the "ATC Handbook") prohibits controllers from restricting speeds of turbojet aircraft, such as the Westwind, to less than 230 knots on departure. The purpose of this provision is to not interfere with the pilots during the busy period following takeoff while climbing, increasing speed, and "cleaning up" the aircraft for climb. Controllers are loathe to ask pilots to reduce speed during this critical departure phase, unless there is a good reason to do so. Controllers are trained to not substitute their judgment for that of the pilots in the details of flying the aircraft; i.e. to not get "into the cockpit." They would not want to distract pilots with unnecessary speed restrictions during climbout.

When there is a conflict between the ATC Handbook, (7110.65H) and a local letter of agreement, the ATC Handbook takes precedence. For this reason, the Ontario controller did not violate the "letter of agreement" by not issuing a speed restriction to the Westwind prior to the handoff. The handoff by Ontario TRACON was proper and in accordance with all applicable procedures.

Assuming arguendo that the Ontario controller should have issued a speed reduction, this deficiency was overtaken by events immediately, since the Coast TRACON controller, Eric Whitaker, issued a speed restriction on initial contact. At 1728:34, the Westwind pilots contacted the Coast TRACON, Tustin sector. The Coast TRACON controller handling the Westwind flight was Eric Whitaker. Mr. Whitaker was an experienced "full performance level" controller. The Coast TRACON supervisor, providing general supervision to the facility, was Antonio Rivas. In their initial contact, the Westwind pilots reported that they were at "thirty seven [hundred feet], climbing to four thousand, we have [ATIS Information] Zulu." Coast TRACON controller Whitaker immediately instructed the Westwind to reduce its speed to 170 knots, and the Westwind pilots acknowl-

edged. Although the Westwind pilots began to decelerate, they did so at a slow rate of deceleration, so that they were still slowing to 170 knots more than two minutes later when cleared for the visual approach.

### b. SEQUENCING

The Plaintiffs allege that the ATC were negligent in failing to sequence the United to follow the Westwind. However, the Court adopts the following findings of fact submitted by defendants, finding the ATC were not negligent in sequencing the Westwind to follow the United.

Mr. Whitaker was sequencing the Westwind behind United Airlines Flight 103, a Boeing 757. The United flight had been instructed to reduce its speed to 170 knots.[3] The two airliners preceding United 103 to Runway 19R (Alpha Air and Eagle Air) had also been instructed to reduce their speed to 170 knots. This reflects the principle of "compatible speeds," in which a series of aircraft are all slowed to the same speed, so that they may follow each other at a fixed spacing.

At 1728:55, Mr. Whitaker instructed United 103 to descend to 3,000 feet from 5,000 feet. As the United Captain testified, there was nothing unusual about the sequence of events on downwind whereby United 103 was first slowed and then descended. In fact, that is the preference of airline pilots, since it is difficult to execute both maneuvers simultaneously. In addition, if United 103 had been cleared to a lower altitude earlier, it would not necessarily have been any lower when intercepting the final approach course, since it is United's policy for "anti-noise" reasons to stay as high as possible while flying visual approaches.

At 1729:43, Mr. Whitaker instructed the Westwind to turn left to a 100–degree heading. The Westwind responded, "Okay, left turn to one zero zero, charlie kilo." This vector was designed to turn the Westwind away from United 103. This would maintain the applicable IFR separation distance of three miles between the Westwind and Unit-

---

3. In contrast to the Westwind's leisurely deceleration, United 103 slowed from 230 knots to 170 knots in approximately one minute. Ex. 9098.

ed 103 in case the Westwind was unable to accept the anticipated visual approach.

Mr. Whitaker's issuance of the 100–degree vector to the Westwind was proper. There was no requirement, as argued by plaintiffs, that Mr. Whitaker include in the vector a statement that this would be a "vector across the ILS final approach course." The Westwind was being vectored for a visual approach, and the statement at issue applies only to vectors for an ILS approach.[4]

There was also no requirement for Mr. Whitaker to state the "purpose" of the vector at the time he issued the 100–degree vector to the Westwind pilots (e.g., "vectors for a visual approach to Runway 19–R,"). A vector normally includes a statement of its purpose, but in this case Mr. Whitaker was busy with several higher-priority duties. Mr. Whitaker gave the Westwind pilots their heading, issued important control communications to United 103 and an America West Boeing 737 (radio callsign "Cactus 667"), then turned back to the Westwind a fraction of a minute later to point out United 103 and issue the visual approach clearance.

Mr. Whitaker used good judgment in prioritizing his actions while sequencing several arriving airplanes, pursuant to the "duty priority" section of the ATC Handbook. There was no deviation from proper procedure in the issuance of the 100–degree vector.

United 103, under the command of by Captain Paul Martin, was flying a typical, normal visual approach to John Wayne Airport. This consisted of approaching from the southwest over the ocean, crossing the shoreline on "downwind" leg at 5000 feet, descending and slowing on downwind, and executing a visual approach. The headings, vectors, speed reductions, and altitudes of the flight of United 103 were all typical and normal. In good weather conditions, pilots always expect visual approaches. Almost every aircraft arriving at John Wayne Airport that night was issued a visual approach clearance.

Although the visual approach of United 103 was steep, it was neither abnormal nor dangerous. On a visual approach, aircraft normally descend at angles significantly above the three degree "glideslope" that is part of the Instrument Landing System (ILS) approach used in bad weather. United Airlines' company policy (not required by the FARs) is for pilots to establish a "stabilized approach" by the time they reach 500 feet above ground level (approximately two miles from the runway). This does not require that they be on the three degree ILS glideslope, but that they be stabilized and not descending more than 1000 feet per minute.

The flight path of United 103 did not violate another controller's airspace without prior coordination, as argued by plaintiffs. United 103 descended through 3,200 feet to 3,000, while turning from base to final, in an area indicated on the "Tustin sector" airspace chart as having a maximum sector altitude of 3,000. The overlying airspace (4,000 feet and above) is normally the responsibility of the "Maverick" sector.[5]

As Mr. Whitaker explained, he had been given control of Cactus 667, the America West 737 approaching from the east at 5,100 feet. According to the facility Standard Operating Practice ("SOP"), Mr. Whitaker in the Tustin sector automatically takes control of Cactus 667 for the descent, and thus controls all the airspace in front of Cactus 667, all the way to the ground. If other traffic had not been in the way, Mr. Whitaker could have cleared Cactus 667 for the visual approach from 5,100 feet, and Cactus 667 could have descended all the way down to the airport without any inter-sector coordination.

Because Mr. Whitaker had control of Cactus 667 for the descent, he also had control of the airspace in front of and below Cactus 667, which included the "3,200 to 3,000" flight path of United that is the subject of criticism. Therefore, Mr. Whitaker had control of this airspace, and he did not need any coordina-

---

4. If the Westwind had declined the visual approach, then Mr. Whitaker would have vectored the Westwind for the ILS approach, stating, when appropriate, that he was vectoring it across the ILS final approach course.

5. The altitude of 3,000 to 4,000 feet in this area is a "buffer zone" that is not part of either sector's airspace. This is designed so that the two controllers could maneuver aircraft at the respective upper and lower limits of their sectors and maintain 1000 feet vertical separation without coordination.

tion for United 103 to fly its approach. Indeed, any such coordination would require Mr. Whitaker to coordinate with himself, an absurd proposition. Mr. Whitaker could also see on his radar screen that there was no conflicting traffic anywhere near United 103 in its descent.

### c. INFORMATION PROVIDED TO PILOTS BY THE AIR TRAFFIC CONTROLLERS

The Plaintiffs allege the ATC were negligent by providing inaccurate/ incomplete information to the Westwind pilots with regard to the United and wake turbulence warnings. However, the Court adopts the following findings of fact submitted by defendants.

At 1730:05, the approach controller stated, "Westwind nine charlie kilo, you're following a United Boeing jet, on base, two o'clock, four miles, southeast bound, four thousand, descending." The Westwind responded, "In sight, charlie kilo." The purpose of this "point out" transmission was to tell the Westwind pilots where to look to see the United jet. It gave adequate information about the location, altitude, heading, and intentions of the United aircraft. The identification as a "United Boeing jet" was a correct and adequate description, pursuant to the ATC Handbook, which requires that an airliner be identified by "manufacturer's name [e.g. Boeing] or model." A description of the aircraft as a "Boeing" alone would have been adequate.

Mr. Whitaker went further in his description by adding that it was a "United" aircraft, and that it was a "jet" aircraft. This description would put a reasonable Westwind pilot on notice that he was following a much larger aircraft with a potentially dangerous wake.

Informing the Westwind pilots that the United Boeing jet was "on base" told them that United 103 was flying the "base leg" of the traffic pattern. This meant to the Westwind crew that the United Boeing Jet was flying roughly perpendicular to the Westwind's flight path and that it would turn right

and proceed on final approach to land at John Wayne Airport.

The statement that the United Boeing Jet was on base "southeast bound" added further useful information. United 103 was in a turn to a heading of 130 degrees, which is southeast. It is standard practice for controllers, when a plane is turning, to point out that plane to other pilots by stating the heading "being turned to." Pilots and controllers alike understand this concept.

At 1730:12, Mr. Whitaker stated, "Westwind nine charlie kilo, follow that traffic, cleared visual approach, runway one niner right, reduce speed to follow, he's slowing through a hundred and seventy [knots]." This clearly meant that the United Boeing Jet would soon be *slower* than 170 knots. At 1730:18, the Westwind responded, "Okay, we're cleared for the visual, we'll follow that traffic at our three o'clock, and we're cleared for the visual, one niner right, slowin' to one seventy."

From an air traffic control perspective, Mr. Whitaker's "point out" of United and the subsequent visual approach clearance to the Westwind was proper and gave the pilots all necessary information.[6] Mr. Whitaker had every reason to believe that the pilots would execute a normal visual approach thereafter, and advise him if there were any problems.

At the time Mr. Whitaker issued the Westwind its visual approach clearance, the Westwind was in an excellent position, from the controller's perspective, for the visual approach. The Westwind was approximately four miles from United; the Westwind had been assigned the same speed as United (170 knots); the Westwind was level at 4000 feet while United 103 was descending through 3,900 feet; and the Westwind was in a turn to 100 degrees (taking it away from United 103).

The pilots' acceptance of a visual approach clearance to "follow" a preceding aircraft constitutes an acknowledgment that the pilots will maintain a safe interval or spacing behind the preceding aircraft, and that they

---

**6.** The four transmissions starting at 1730:05 took only 13 seconds. They should be read together and in the context of other information, such as

the pilots' prior acknowledgment that they had received ATIS information Zulu.

accept responsibility for their own wake turbulence separation. The acceptance of a visual approach clearance cancels all previous ATC assignments of heading, altitude and speed, transferring these elements to the control of the pilots. This shift in responsibility was testified to by both pilot witnesses and ATC witnesses.

The pilots' acceptance of a visual approach clearance also eliminates any responsibility of the controllers to apply in-flight IFR separation (in this case, the 3 mile minimum between the Westwind and United 103). The pilot on a visual approach may maneuver his aircraft at his discretion, following the preceding aircraft as closely as he deems appropriate in order to provide his own separation and wake turbulence avoidance.

A Mitre Corporation study of visual approaches nationwide revealed that pilots typically "close up" to a distance of between 1.9 and 2.1 miles behind the lead aircraft while flying visual approaches. In this context, the two-mile spacing that the Westwind pilots chose to provide for the last two minutes of the flight was absolutely normal and unremarkable from the controllers' perspective.

The only applicable ATC separation criterion for aircraft on a visual approach is "runway separation," applied by the tower controller. This provides that at the time the second aircraft is over the landing threshold, the first aircraft must have cleared the runway. If the runway is not clear, the tower must issue a "go around" instruction.

After accepting the visual approach clearance, it was the responsibility of the Westwind crew to maneuver their aircraft at their discretion for a safe approach and landing. A reasonable Westwind pilot, instructed to follow a "United Boeing Jet," would be very concerned about potential wake turbulence affecting his much smaller aircraft.

The description of United 103 as a "United Boeing Jet" was adequate to alert a reasonable Westwind pilot to the presence of major, hazardous wake turbulence. Whether the United was a 737, 757, 767, or 747, was irrelevant: each of these aircraft creates a wake that is very hazardous to a Westwind. A reasonable Westwind pilot would give a "wide berth" to avoid the "danger zone" behind and below the United jet.

Pilots are trained that wake turbulence can be a serious hazard to aircraft, especially to a small aircraft such as the Westwind in trail of a large aircraft such as an airliner. The characteristics of wake turbulence are described in detail in the AIM. The main duty of the Westwind crew while on the visual approach was to stay safely above the wake of the preceding United Boeing jet. To do this, pilots should visualize the location of the preceding aircraft's flight path, and ensure that their flight path remains above it.

One commonly used pilot technique to visualize flight paths was described by visibility and pilot expert Warren DeHaan. The technique involves drawing an imaginary line from your aircraft to the runway threshold, and looking to see whether the preceding aircraft is above or below this line. This can be done even before the preceding aircraft intercepts the final approach course (e.g., when the preceding aircraft is approaching on a base leg from the side). If the preceding aircraft is above the line at any time, pilots should be aware of potential danger, and apply appropriate wake avoidance techniques. Whatever technique the pilots may choose to apply, they are responsible for ensuring that their flight path remains safely above that of any preceding larger aircraft.

Among the options available to the Westwind pilots to avoid wake turbulence were: (1) maintaining adequate altitude, by not starting their descent from 4000 feet until they were safely above the flight path of United 103, then descending above its flight path and landing beyond its touchdown point; (2) continuing the turn to 100 degrees and then turning back towards the runway, and doing "s-turns" or other maneuvers to increase their spacing behind United 103; and (3) providing ample lateral separation from United 103. Preferably, all three techniques would be applied in combination. All of these options involve only normal, routine piloting maneuvers. If these measures did not suffice, the pilots had the option at any time of executing a "go around" and making a second approach.

In fact, the Westwind pilots did none of the above. Instead, (1) they descended precipitously (at a greater "rate of descent" than

United 103) until they reached an altitude *under* its flight path; (2) they turned immediately straight towards the runway, following directly behind United 103 on the final approach course, instead of flying an offset path or "s-turning"; and (3) they did not slow expeditiously (by extending speed brakes, landing gear, and flaps). As pilot expert Joseph Lintzenich explained, the Westwind crew flew an approach profile that included all the elements necessary for a demonstration of how intentionally to encounter (rather than to avoid) the United's wake. They essentially did everything wrong.

Proper altitude control alone would have prevented a wake encounter, since wake turbulence only moves downward from the preceding aircraft, and staying above its flight path guarantees safety. In essence, the Westwind initially should have stayed level or descended gradually; then, when the Westwind was positioned safely well above United 103's flight path, the Westwind should have descended more steeply.[7] Instead, the Westwind pilots did the opposite: they descended steeply at first, putting themselves below United 103's flight path, and then later descended more gradually.

Although plaintiff's visibility expert Dr. Arthur Ginsburg and pilot expert Donald Lykins testified that it was extremely difficult for the Westwind pilots to determine their flight path relative to United 103, these opinions are contradicted by the Westwind crew's own words.

The Westwind was equipped with a "cockpit voice recorder" which recorded the voices of the two pilots. A transcript of this recording (the "CVR transcript") was prepared by the National Transportation Safety Board.

The CVR Transcript reveals several comments indicating that the crew did observe United 103's flight path, and *did* realize that they were flying into danger:

— "He's [United 103] pretty close" (1730:26);

— "He's a little high too on the approach" (1731:53);

— "I think we'll run this a dot high given where he's at ..." (1732:13)

— "Yeah we might still get a little wake turbulence there" (1732:17)

— "I don't know, looks kinda close" (1732:34)

— "Yeah it's close but I think we'll be okay" (1732:35).

As intra-cockpit communications, none of these statements could be heard by the air traffic controllers. The crew did not communicate any of their doubts or concerns to the controllers. None of the controllers knew or had any reason to know of the flight path observations and concerns being discussed by the pilots.

Even the *last* of these communications ("Yeah it's close ....") was made approximately 43 seconds before the accident (1732:35 to 1733:18). Therefore, the Westwind crew had ample time to have executed a safe "go around," even at this late point, and thereby to have avoided the accident.

At 1730:42, the approach controller radioed: "Westwind nine charlie kilo, traffic you're following is at a hundred and fifty knots, you can s-turn as necessary to follow that traffic, contact John Wayne Tower, [frequency] one two six point eight." At 1730:49, the first officer responded: "Okay, we'll slow it up and do what we have to do, and we're switching [to the tower] ...." Ex. 316, at 25.

At no time did controller Whitaker believe there was any potential wake turbulence hazard for the Westwind. The ATC Handbook provides for the mandatory issuance of wake turbulence cautionary advisories only when the preceding aircraft is a "heavy" jet (which United 103 was not: both the United 757 and the Westwind were in the "large" category). For all non-heavy aircraft, the issuance of a wake turbulence cautionary advisory is appropriate only when, in the controller's opin-

---

**7.** A gradual descent followed by a steeper one was well within the aircraft's capabilities. Flight plots reveal that the Westwind descended at an angle of 8—9 degrees after accepting the visual approach clearance. A test flight in a similar Westwind conducted by pilot expert Warren De-

Haan demonstrated that descent angles up to 12 degrees were not a problem. Staying slightly above the United's 5.6 degree flight path, and then descending more gradually in the final mile or so for a gentle landing should have posed no difficulty to the Westwind pilots.

ion, wake turbulence may have an adverse effect on an aircraft. Mr. Whitaker had no reason to anticipate such a wake encounter, and he therefore did not issue a cautionary advisory. The radar targets displayed on Mr. Whitaker's radar screen always showed the Westwind at a higher altitude than United. Only the Westwind crew had the ability to compare the two flight paths; Mr. Whitaker did not.

Controller Whitaker relied on the Westwind pilots to follow the Federal Aviation Regulations (FARs), the guidance in the AIM, and good operating practices.

At 1731:04, the Westwind contacted the John Wayne Tower. On duty in the tower, manning the Local Control One position (combined with Local Control Two), was air traffic controller James Zimmerman. Mr. Zimmerman, a former United States Air Force Controller, was a full performance level controller responsible generally for issuing takeoff and landing clearances for all active runways, as well as taxiing ground traffic across those runways.

In its initial radio transmission to the tower, the Westwind pilots reported that they were "on a visual [approach] behind the, ah, I believe United." The local controller responded, "Westwind three zero nine charlie kilo, John Wayne Tower, [you're] number three behind the United, he's indicating thirty knots slower." The first officer responded, "Ah, we're slowing, three zero nine charlie kilo." There were no further communications between the Westwind and the Tower. At this time, the Westwind was at 3,400 feet and about 2.2 miles behind United 103 which was at about 2,800 feet.

At 1731:57, the Westwind pilot stated, "I'll slightly 'S'[-turn] back and forth." Despite this statement, any such "s-turns" were so minor as to be imperceptible on the radar track: the Westwind continued straight towards the runway.

At 1732:13, the captain stated, "I think I'll run this a dot high given where he's at John." The first officer responded, "You bet," in a concerned voice. Flying a "dot high" refers to flying the aircraft so that the aircraft's "glideslope" instrument depicts the aircraft's position as being one dot or grada-

tion above the glideslope. This results in the aircraft flying an approach path that is a fraction of a degree above the standard three degree glideslope, for a height increase of approximately 30 feet per mile from the airport. Despite this statement, the Westwind descended slightly *below* the glideslope, and then moved back up to the glideslope.

The crew's reference to the "dot high" technique does reveal their strategy to deal with the anticipated wake encounter that they had been discussing. Unfortunately, they chose a flawed technique. If United 103 had been on an ILS approach, and therefore flying the three-degree ILS glideslope, the "dot high" technique could provide the Westwind with a tiny extra safety margin (the main margin would be provided by the fact that wakes descend at between 300—500 feet per minute). However, the "dot high" technique had no applicability to the Westwind's visual approach behind United 103 on its observed high visual approach descent.

Aircrafts on visual approaches do not fly on the three degree ILS glideslope, but normally approach at much steeper angles.

The accident occurred at approximately 1733:18. The last radar target on the Westwind was at 1733:07. At this time, the Westwind was at 1100 feet MSL, approximately 2.1 nautical miles behind United 103. The aircraft crashed approximately 3.2 nautical miles short of the runway.

Two minutes elapsed between the Westwind's last radio communication to the Tower and the accident (1731:13 to 1733:18). During this period, controller Zimmerman handled his traffic (both airborne and ground traffic), coordinated with other tower positions for runway crossings, monitored the airport and surrounding area visually, and consulted his BRITE radar scope as necessary.

Mr. Zimmerman did not observe anything unusual about the Westwind at any time before the accident. Tower controllers cannot determine flight paths of aircraft, but can only see a present-moment "snapshot" of where the aircraft is at the time of observation.

Determining the position and altitude of aircraft at night visually from the tower cab is extremely difficult. At times, this involves trying to discern whether one target is "one-quarter inch" higher than another when far away in the night sky. Moreover, the tower is offset to the side and located partly down the runway, further complicating the viewing task. This phenomenon was explained by optometrist Warren DeHaan, describing the difficult optical geometry involved in viewing aircraft lights from the tower at night. As Mr. Zimmerman periodically looked at the landing lights of various approaching aircraft, including United 103 and the Westwind, he did not observe anything out of the ordinary.

If Mr. Zimmerman had looked at the indicated altitudes of United 103 and the Westwind on his BRITE radar screen at any time that the aircraft were on his frequency, he would have observed that the Westwind was always above the altitude of United 103. This was true even though the actual flight path of the Westwind was significantly below that of United, as observed by the Westwind pilots.

Mr. Zimmerman testified that it would have been impossible for him to visualize and compare the flight paths of two aircraft such as the Westwind and United 103.[8] To do that, he would have to observe the altitude of each aircraft as it passed a specific location, and remember that altitude for an extended period of time. This would be impossible to do while performing his other responsibilities at Local Control One and Two. At no time did controller Zimmerman believe there was any potential wake turbulence hazard for the Westwind.

The ATC Handbook provides for the mandatory issuance of wake turbulence cautionary advisories only when the preceding aircraft is a "heavy" jet (which United 103 was not). For all other aircraft, the issuance of an advisory is appropriate only when, in the controller's opinion, wake turbulence may have an adverse effect on an aircraft. Mr. Zimmerman had observed thousands of aircraft fly similar-appearing visual approaches over many years, without any incidents or complaints. Mr. Zimmerman had no reason

to anticipate such a wake encounter from what he knew and observed of the flight of the Westwind, and he therefore did not issue a cautionary advisory, nor was one required.

Controller Zimmerman relied on the Westwind pilots to follow the Federal Aviation Regulations (FARs), the guidance in the AIM, and good operating practices. His one radio transmission to the Westwind provided it with all necessary and required information, and he had no reason to take any additional actions.

At no time did the controllers believe nor did they have reason to believe, that the Westwind was in a position of danger or potential danger. Moreover, at no time did the crew of the Westwind request any assistance from ATC, report any problem or difficulty, or ask for any additional information or assistance.

For over two minutes before the accident, the Westwind pilots flew a fixed two-mile distance behind United 103. From the controllers' perspective, this spacing was normal and typical for aircraft flying a visual approach. The Westwind did not have to transition through the wake of United 103 in order to stay above its flight path on the final approach course.

Based on the ground tracks, airspeeds, and altitudes of the Westwind and United 103, and the positive radio transmissions from the Westwind pilots (e.g. "we'll slow it up and do what we have to do ... "), the controllers had every right to believe, and did reasonably believe, that the crew of the Westwind would maintain a safe distance above and behind the flight path of United 103.

No controller violated or deviated from any mandatory ATC procedure, regulation, standard operating practice, letter of agreement, or other requirement. No action or inaction of any controller caused or contributed in any way to the accident.

The air traffic controllers who provided ATC services to the Westwind acted professionally, prudently, and in accordance with applicable manual provisions, practices, and

8. This could only be done by the Westwind pilots. They were the only ones in a position to observe their flight path below that of United 103 as they descended into the "danger zone." As noted above, they did observe and discuss this.

procedures. Their actions in no way caused or contributed to this accident.

Robert Nietzel, plaintiffs' ATC expert on tower issues, testified to a personal practice unrelated to the conduct of a reasonable controller. Mr. Nietzel testified that, when he was a controller, he always gave wake turbulence cautionary advisories to any aircraft following a Boeing 757. Mr. Nietzel admitted that this is not the standard provided for in the ATC Handbook. His unvarying issuance of advisories, whether or not required, sheds no light on the standards to be applied in a negligence case.

Plaintiffs' visibility expert, Arthur Ginsburg, Ph.D. testified that Mr. Whitaker should have issued to the Westwind the range and altitude of United 103 in half-mile increments. This absurd assertion would seem to require an individual air traffic controller for every airplane. Although plaintiffs' counsel promised to produce an expert witness who would testify that this was the standard, no such testimony was ever offered.

Plaintiff's ATC expert on radar issues was R.P. Burgess. Just before his retirement from the FAA, Mr. Burgess was suspended by the FAA for 12 days, removed from a supervisory position, and demoted. Mr. Burgess demonstrated his lack of credibility by opining, in response to an inquiry by the Court, that the Westwind pilots bore *no* responsibility for this accident, in the face of overwhelming evidence to the contrary.

## B. CONCLUSIONS OF LAW

This is an action under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–2680. The Court adopts the following conclusions of law submitted by Defendants, finding the ATC were not negligent in this matter.

■ In this action, Plaintiffs allege operational error on the part of FAA air traffic controllers at the Ontario TRACON, Coast TRACON, and John Wayne Airport Control Tower, and further allege various errors on the part of FAA headquarters employees.

Specifically, Plaintiffs contend that the controllers were negligent in the sequencing and separation of the aircraft and in failing to provide necessary information and warnings to the Westwind crew including more detailed identification of the lead aircraft and wake turbulence warnings. The Court has subject matter jurisdiction over Plaintiffs' claims concerning controller negligence. 28 U.S.C. § 1346(b).

■ In this case, the substantive law of California controls with respect to claims of air traffic control negligence. *See* 28 U.S.C. § 1346(b); *see also Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

■ The essential elements of actionable negligence under California law are the following: (a) a legal duty to use due care; (b) a breach of such legal duty; and (c) the breach as the "substantial factor" of the resulting injury. *Sanbutch Properties, Inc. v. United States*, 343 F.Supp. 611, 614 (N.D.Cal.1972); *see also Rudelson v. United States*, 431 F.Supp. 1101, 1107 (C.D.Cal. 1977), *aff'd*, 602 F.2d 1326 (9th Cir.1979). Plaintiffs have the burden of proving each of these elements by a preponderance of the evidence. BAJI 2.60.

■ Plaintiffs have failed to meet their burden of proof in establishing ATC negligence by a preponderance of the evidence. "In airplane tort cases, general negligence law applies; however 'the standard of due care is concurrent, resting upon both the airplane pilot and ground aviation personnel. Both are responsible for safe conduct of flight.'" *Beech Aircraft Corp. v. United States*, 51 F.3d 834, 838 (9th Cir.1995) (quoting *Spaulding v. United States*, 455 F.2d 222, 226 (9th Cir.1972)). "While the duty in an airplane tort case is a concurrent one, resting on both air traffic controllers and pilots, 'under VFR conditions, ultimate responsibility for the safe operations of an aircraft rests with the pilot.'" *Beech Aircraft Corp.*, 51 F.3d at 840 (9th Cir.1995) (quoting *Hamilton v. United States*, 497 F.2d 370, 374 (9th Cir.1974)).

An air taxi operator has a duty to exercise the highest degree of care in protecting his passengers from injury. California Civil Code §§ 2100 and 2101.

Violations of the Federal Aviation Regulations (FARs) constitute negligence as a matter of law. *Rudelson v. United States,* 602 F.2d 1326 (9th Cir.1979) *United States v. Miller,* 303 F.2d 703 (9th Cir.1962), *cert. denied,* 371 U.S. 955, 83 S.Ct. 507, 9 L.Ed.2d 502 (1963); *Jenrette v. United States,* 14 Avi. Cases (CCH) 17,798 (C.D.Cal.1977); *Hamilton v. United States,* 343 F.Supp. 426 (N.D.Cal.1971), *aff'd,* 497 F.2d 370 (9th Cir. 1974).

Under the FARs, the pilot in command is directly responsible for, and is the final authority as to the operation of his aircraft. 14 C.F.R. § 91.3(a); *Hamilton v. United States,* 497 F.2d 370, 374 (9th Cir.1974), *aff'g* 343 F.Supp. 426 (N.D.Cal.1971); *Spaulding,* 455 F.2d at 226. The "ultimate decision is the pilot's, since ... 'the crew knows the condition of the aircraft, its capabilities and must deal with the unusual and unexpected during flight.'" *Neff v. United States,* 420 F.2d 115, 120 (D.C.Cir.1969), *cert. denied,* 397 U.S. 1066, 90 S.Ct. 1500, 25 L.Ed.2d 687 (1970) (quoting the district court, *Neff v. United States,* 282 F.Supp. 910 (D.D.C.1968)).

Pursuant to 14 C.F.R. § 91.3(a), the pilot has "final authority, even over air traffic controllers." *In re Air Crash Disaster at John F. Kennedy Int'l Airport (JFK),* 635 F.2d 67, 74 (2d Cir.1980).

Under the FARs, pilots are prohibited from operating an aircraft in a careless or reckless manner so as to endanger the life or property of another. 14 C.F.R. § 91.9.

The Airman's Information Manual (AIM) is an FAA publication whose purpose is to instruct pilots about basic flight information, air traffic control procedures, and general instructional information. Pilots must study and know the appropriate provisions of the AIM and FAA Advisory Circulars (ACs) pertaining to their flying activities. These documents are evidence of the standard of care among all pilots. *Dyer v. United States,* 832 F.2d 1062, 1069 (9th Cir.1987)(citing *Muncie Aviation Corp. v. Party Doll Fleet, Inc.,* 519 F.2d 1178, 1180 (5th Cir.1975)); *In re Air Crash Disaster at JFK,* 635 F.2d at 75–76.

The AIM states, in part: "When visually following a preceding aircraft, acceptance of the visual approach clearance constitutes acceptance of pilot responsibility for maintaining a safe approach interval and adequate wake turbulence separation." "A visual approach is not an Instrument Approach Procedure." "Visual approaches are initiated by ATC to reduce pilot/controller workload and expedite traffic by shortening flight paths to the airport." This paragraph also states that, "It is the pilot's responsibility to advise ATC as soon as possible if a visual approach is not desired."

The AIM further informs pilots that, "Acceptance of a visual approach clearance to visually follow a preceding aircraft is pilot acknowledgment that he will establish a safe landing interval behind the preceding aircraft if so cleared, and that he accepts responsibility for his own wake turbulence separation."

There are also numerous warnings and illustrations published in the AIM regarding the hazards of wake turbulence, including the following: "It is more difficult for aircraft with short wingspan (relative to the generating aircraft) to counter imposed roll induced by vortex flow. Pilots of short span aircraft, even of the high performance type, must be especially alert to vortex encounters." "The wake of larger aircraft requires the respect of all pilots." "Serious and even fatal GA [General Aviation] accidents are not uncommon." "AVOID THE AREA BELOW AND BEHIND THE GENERATING AIRCRAFT, ESPECIALLY AT LOW ALTITUDE WHERE EVEN A MOMENTARY WAKE ENCOUNTER COULD BE HAZARDOUS." Whether or not a "caution-wake turbulence" warning has been given, "THE PILOT IS EXPECTED TO ADJUST HIS OR HER OPERATIONS AND FLIGHT PATH AS NECESSARY TO PRECLUDE SERIOUS WAKE ENCOUNTERS."

The AIM also recommends vortex avoidance procedures for various situations. For example, "Landing behind a larger aircraft—same runway: Stay at or above the larger aircraft's final approach flight path—note its touchdown point—land beyond it." In addition, the AIM informs pilots that "the flight disciplines necessary to ensure vortex avoidance during VFR operations must be exercised by the pilot. Vortex visualization and avoidance procedures should be exercised by

the pilot using the same degree of concern as in collision avoidance."

■ The information contained in the AIM, particularly the section concerning the nature, behavior, and danger of wake turbulence, is chargeable to all certificated pilots and is evidence of the standard of care for determining whether they exercise proper wake turbulence avoidance procedures. *Dyer*, 832 F.2d at 1069; *Muncie Aviation Corp.*, 519 F.2d at 1181; *Thinguldstad v. United States*, 343 F.Supp. 551 (S.D.Ohio, 1972).

■ Professional flight crews are "charged with that knowledge which in the exercise of the highest degree of care they should have known." *American Airlines v. United States*, 418 F.2d 180, 193 (5th Cir. 1969).

Under Visual Flight Rule (VFR) weather conditions, the pilot's duty to see and avoid other aircraft also includes the requirement that he exercise the same degree of caution to visualize and avoid wake turbulence encounters with other aircraft. 14 C.F.R. § 91.65(a); 14 C.F.R. § 91.67(a); Ex. 9001; *Wasilko v. United States*, 300 F.Supp. 573 (N.D.Ohio 1967), *aff'd*, 412 F.2d 859 (6th Cir.1969).

■ In clear weather conditions the pilots, not the air traffic controllers, bear the primary responsibility to visualize and avoid the hazard of wake turbulence. *Kack v. United States*, 570 F.2d 754, 756 (8th Cir. 1978), *aff'g*, *Kack v. United States*, 432 F.Supp. 633 (D.Minn.1977); *See* Airman's Information Manual, Para. 7–45, Ex. 9001.

■ Pilots have a duty to be aware of hazards of wake turbulence; to be aware of the procedures for avoidance of wake turbulence; to obtain all available information concerning the flight, including weather and wind information; to comply with authorizations, clearances, and instructions; and to operate the aircraft in a careful manner so as not to endanger the life and property of another. *Sanbutch Properties, Inc. v. United States*, 343 F.Supp. at 615.

■ Air traffic controllers are held to a standard of ordinary care with respect to their responsibilities, which are concurrent with the duties of pilots. *Spaulding*, 455

F.2d at 226. "It is not enough to say that the pilot and controller are concurrently responsible (for accomplishing a safe flight), they must also be concurrently liable, and one does not necessarily follow the other even if both are found negligent." *Tinkler v. United States*, 700 F.Supp. 1067, 1074 (D.Kan.1988), *aff'd*, 982 F.2d 1456 (10th Cir. 1992) (quoting *Roland v. United States*, 463 F.Supp. 852, 854 (S.D.Ind.1978)); *see also In re Aircrash Disaster at Boston, Massachusetts*, 412 F.Supp. 959, 989 (D.Mass.1976), *aff'd sub nom. Delta Air Lines, Inc. v. United States*, 561 F.2d 381 (1st Cir.1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978) ("pilot's knowledge of his own, his crew's, and his aircraft's capabilities and limitations, is of preeminent importance in this cooperative situation. None of these matters can be known by ATC.").

■ The basic duties and responsibilities of controllers are set forth in the Air Traffic Control Handbook, FAA Order 7110.65H (the ATC Handbook). This is an internal agency document, and although FAA employees must be familiar with the provisions of the manual, the provisions of the Handbook are not statutes or regulations, and it does not necessarily follow that any deviation from these provisions constitutes negligence under the Federal Tort Claims Act. *Baker v. United States*, 417 F.Supp. 471, 485 (W.D.Wash.1975).

The ATC Handbook provides guidance and procedures for controllers with respect to "visual approaches." Specifically, the ATC Handbook provides "[a] visual approach is an authorization for an aircraft on an IFR flight plan to proceed visually to the airport of intended landing; it is not an instrument approach procedure." In addition, the ATC Handbook states in relevant part that, "A vector for a visual approach may be initiated if the reported ceiling at the airport of intended landing is at least 500 feet above the MVA/MIA [minimum vectoring altitude/minimum IFR altitude] and the visibility is three miles or more." Finally, the ATC Handbook advises controllers to (1) "[r]esolve potential conflicts with other aircraft, and ensure that the weather conditions at the airport are VFR" before issuing a clearance for a visual

approach; and to (2) clear an aircraft for a visual approach when "the aircraft is to follow a preceding aircraft and the pilot reports the preceding aircraft in sight and is instructed to follow it."

The Handbook states in relevant part, "Issue cautionary information to any aircraft if in your opinion wake turbulence may have an adverse effect on it." "Because wake turbulence is unpredictable, the controller is *not responsible* for anticipating its existence or effect."

In accordance with the Handbook provisions, the first priority of an air traffic controller is separation of aircraft for collision avoidance. *In re Air Crash at Dallas/Fort Worth on August 2, 1985,* 720 F.Supp. 1258, 1288 (N.D.Tex.1989), *aff'd,* 919 F.2d 1079 (5th Cir.), *cert. denied sub nom., Connors v. United States,* 502 U.S. 899, 112 S.Ct. 276, 116 L.Ed.2d 228 (1991). The provision of information and warnings specified in the Handbook, such as wake turbulence advisories, is secondary to the primary duty of separation. The air traffic controller must decide, in his judgment, whether other duties permit the performance of these services. *Id.*

■ In addition, there is "no duty to warn a pilot of a condition of which he would ordinarily know or of which he should be aware based on his training, experience and personal observations." *Beech Aircraft Corp.,* 51 F.3d at 840 (citing *Neff v. United States,* 420 F.2d 115, 120–22 (D.C.Cir.), *cert. denied,* 397 U.S. 1066, 90 S.Ct. 1500, 25 L.Ed.2d 687 (1970)). *See also Pan American World Airways v. Port Authority of New York and New Jersey,* 787 F.Supp. 312, 319 (S.D.N.Y.), *rev'd on other grounds,* 995 F.2d 5 (2d Cir.1993); *Crossman v. United States,* 378 F.Supp. 1312, 1318 (D.Ore.1974).

■ Air traffic controllers may rely on the assumption that a pilot knows and will abide by all applicable FARs. This includes information contained in the Airman's Information Manual, FAA Advisory Circulars, and aeronautical charts. *Hensley v. United States,* 728 F.Supp. 716, 722 (S.D.Fla.1989); *Associated Aviation Underwriters v. United States,* 462 F.Supp. 674, 680 (N.D.Tex.1978); *In re Air Crash Disaster at New Orleans (Moisant Field), Louisiana on March 20,* *1969,* 422 F.Supp. 1166, 1177–78 (W.D.Tenn.), *aff'd,* 544 F.2d 270 (6th Cir.1976).

■ "Moreover 'controllers are not required to foresee or anticipate the unlawful, negligent or grossly negligent acts of pilots.'" *Beech Aircraft Corp.,* 51 F.3d at 840 (quoting *In re Air Crash at Dallas/Ft. Worth Airport,* 720 F.Supp. 1258, 1290 (N.D.Tex. 1989), *aff'd,* 919 F.2d 1079 (5th Cir.), *cert. denied sub nom., Connors v. United States,* 502 U.S. 899, 112 S.Ct. 276, 116 L.Ed.2d 228 (1991)).

■ Under visual meteorological conditions, "air traffic controllers expect, and have the right to expect, pilots to maintain their own in-flight separation from other aircraft and from wake turbulence." *Jenrette,* 14 Avi. Cases (CCH) at 18,000.

"It has been specifically held as a matter of law that a reasonable pilot, upon being informed that he was to follow a large jet on approach, would fly at an altitude above the descent path of the preceding airplane and controllers have a right to assume pilots will so fly." *Id.* at 18,002 (citing *Richardson v. United States,* 372 F.Supp. 921 (N.D.Cal. 1974)); *Sanbutch Properties,* 343 F.Supp. at 616.

■ "Air traffic controllers have a right to expect that pilots have been trained to maintain a flight path above that of the preceding aircraft and to touch down at a point beyond the point of touchdown of the preceding aircraft." *Jenrette* at 18,000.

"Air traffic controllers cannot be expected, under VFR circumstances where the responsibility for in-flight separation belongs to the pilot and where controllers' visibility is limited by the capability of the human visual system to make distance and height judgments, to substitute their judgment for that of the pilot who is in a far superior position to make such judgments." *Id.*

"The failure to provide a wake turbulence advisory cannot be considered the proximate cause of an accident where it results from wake turbulence where the pilot knew or should have known the hazards and the procedures designed to avoid the wake turbulence." *Id.* at 17,802–17,803.

The *Jenrette* case was cited with approval by the Ninth Circuit in *Dyer*, 832 F.2d at 1070. In *Dyer*, a small aircraft crashed during an approach following the landing of a large Coast Guard helicopter. In affirming the District Court's finding that the Coast Guard's conduct was not a substantial factor in the crash of the small plane, the Ninth Circuit stated, "Even at controlled airports where air traffic controllers help direct pilots, the primary and ultimate responsibility for safe aircraft operation under visual flight rules, including wake turbulence avoidance, rests with the pilot." *Id.*, (citing *Miller v. United States*, 587 F.2d 991, 995–96 (9th Cir.1978); *Kack*, 570 F.2d at 755–56 (controller had no special duty to warn pilot of his precariously low altitude because pilot, even though a student, had primary responsibility to avoid wake turbulence); *Jenrette*, 14 Avi. Cases (CCH) at 18,001). "The responsibility for avoiding wake turbulence is placed on the pilot under visual flight rules because the pilot is in the best position to visualize the location of the vortex trail behind large aircraft and to do whatever is necessary to avoid the hazard." *Dyer* at 1070 (citing *N–500L Cases*, 517 F.Supp. 825, 833 (D.P.R. 1981), *aff'd*, 691 F.2d 15 (1st Cir.1982)).

■ "The function of avoiding wake turbulence in VFR conditions must rest with the pilot, as he is the person who can best do something about it and is in complete control of his aircraft; he is in the best position to observe the aircraft landing before him, as he has a better view of the runways, and can better correlate the totality of events with his situation." *Sanbutch Properties*, 343 F.Supp. at 615.

■ The Handbook does not impose an absolute duty to advise a pilot of wake turbulence when, in the controller's judgment, there was no basis for so doing. *Id.*

■ The failure of air traffic controllers to give a wake turbulence advisory or warning "where the air traffic personnel are fully engaged in performance of higher priority duties, cannot be the proximate cause of an accident resulting from a wake turbulence encounter where the pilot knew, or should have known, of hazards and avoidance procedures, and was on notice and aware of presence and proximity of generating aircraft." *Id.*

The AIM informs pilots that,

Many towers are equipped with a tower radar display. The radar uses are intended to enhance the effectiveness and efficiency of the local control, or tower, position. They are not intended to provide radar services or benefits to pilots except as they may accrue through a more efficient tower operation.

In addition, this AIM contains the following notation:

There is no controller requirement to maintain constant radar identification. In fact, such a requirement could compromise the local controller's ability to visually scan the airport and local area to meet FAA responsibilities to the aircraft operating on the runways and within the CLASS B, C, and D SURFACE AREA. Normally, pilots will not be advised of being in radar contact since that continued status cannot be guaranteed and since the purpose of radar identification is not to establish a link for the provision of radar services.

The AIM advises pilots in capital letters: WHEN IN COMMUNICATION WITH A TOWER CONTROLLER WHO MAY HAVE RADAR AVAILABLE, DO NOT ASSUME THAT CONSTANT RADAR MONITORING AND COMPLETE ATC SERVICES ARE BEING PROVIDED.

■ A controller must give his attention to all aircraft in his control area and should not focus or concentrate on one area to the exclusion of others. *Hamilton*, 497 F.2d at 376.

While the approach controller was responsible for sequencing the Westwind into the traffic pattern, the flight crew of The Westwind was responsible for selecting its own altitude, flight path, rate of descent, speed and distance behind the aircraft it was instructed to follow. *See Richardson*, 372 F.Supp. at 927 (citing *United Air Lines v. Wiener*, 335 F.2d 379 (9th Cir.1964), *cert. denied*, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964)); *United States v. Miller*, 303 F.2d 703 (9th Cir.1962), *cert. denied*, 371 U.S. 955, 83 S.Ct. 507, 9 L.Ed.2d 502 (1963).

The failure of the Westwind flight crew to maintain proper in-trail wake turbulence separation and avoidance "is an unforeseeable fact for which the [controllers] cannot be charged with responsibility." *See Richardson,* 372 F.Supp. at 927. To avoid wake turbulence, pilots are expected to maintain a flight path at or above that of the preceding aircraft, regardless of its make or model.

Whether the Westwind pilots knew they were following a Boeing 757 is immaterial; they acknowledged they were following a commercial airliner; specifically, a "United Boeing Jet." As experienced pilots, in visual contact with the United airliner, the Westwind crew either knew or should have known they (1) were following a larger aircraft; and (2) were required to fly at or above its final approach flight path. AIM para. 7–46(1).

In conclusion, this Court cannot find that the Defendant was negligent or that the conduct of the Westwind flight crew, in failing to avoid the wake turbulence from United 103, was reasonably foreseeable by *any* employee of the Defendant, or that any such employee violated a duty owed to Plaintiffs, or that any such employee's conduct was a factor, let alone a substantial contributing factor, in the accident.

## V. CONCLUSION

Based on the foregoing, the Court hereby GRANTS summary adjudication in favor of the United States on the claims alleging Headquarters FAA negligence. In addition, the Court hereby adopts The United States' Proposed Findings of Fact and Conclusions of Law, holding that the Air Traffic Controllers were not negligent in this matter.

**IT IS SO ORDERED.**